237 So.2d 311 (1970)
Glenn GEER, Appellant,
v.
Ames BENNETT and John B. Marion, Appellees.
No. 69-81.
District Court of Appeal of Florida, Fourth District.
June 8, 1970.
Rehearings Denied August 6, 1970.
*312 Larry Klein, of Cone, Wagner, Nugent, Johnson, McKeown & Dell, West Palm Beach, for appellant.
Charles H. Damsel, Jr., and John R. Beranek, of Jones, Adams, Paine & Foster, West Palm Beach, for appellee Bennett.
Kirk Sullivan, West Palm Beach, for appellee Marion.
*313 CROSS, Chief Judge.
Appellant-plaintiff, Glenn Geer, appeals from a final judgment entered by the court in favor of the appellees-defendants, Ames Bennett and John B. Marion, in a cause of action in negligence against the defendants who are architects, for damages sustained by the plaintiff, a concrete mason, when he fell from the second floor of a building under construction. We reverse.
On September 21, 1964, the County of Palm Beach entered into a written contract with the defendants, Ames Bennett and John B. Marion, to draw up plans and specifications for the construction of a new airport terminal building at the Palm Beach International Airport and to supervise the construction of the work. After the plans and specifications had been drawn, Palm Beach County let the contract for construction of the airport terminal building to the Arnold Construction Company, and the defendants, Ames Bennett and John B. Marion, undertook to supervise the construction work pursuant to the terms and provisions of the contract. The plaintiff, Glenn Geer, was a concrete mason employed by Arnold Construction Company.
At the time of the accident which gave rise to this cause of action, the plaintiff was engaged in pouring a floor slab for the mezzanine floor of the terminal building. The plaintiff was injured when he fell from the second floor of the building under construction while walking along a wooden form on the outside of a recently poured section of this slab. The building at that particular time was at the stage of construction in which the walls had not been erected on the second floor and there were no guard rails or any other protective device to prevent persons working on the second floor from falling.
The plaintiff brought suit against the defendant-architects for the personal injuries he suffered as the result of the fall from the scaffold. The fourth amended complaint as filed by the plaintiff, leaving out those parts which are formal and superfluous, alleged as follows. That on or about September 21, 1964, the defendant-architects were employed by Palm Beach County, Florida, to prepare detailed construction drawings, specifications and other documents for the construction of an airport terminal complex to be located in Palm Beach County, Florida; that the defendants and Palm Beach County entered into a contract on or about September 21, 1964, which in addition to committing to the defendants the preparation of construction drawings, specifications and other documents, made it the defendants' responsibility to consult and assist Palm Beach County in the selection of a resident project representative, to make daily visits to the construction site to observe the progress of the construction, to provide detailed instructions to the resident project representative, to provide proper prosecution of the construction work and supervision of same, to ascertain and assure that the construction work was progressing in strict accordance with the plans and specifications and the requirements of the funding and regulatory agencies, to directly supervise the field activities of the resident project representative and to maintain direct supervision over the contractors in the prosecution of their work. The contract between the architects, the contractor and Palm Beach County was attached to the complaint as an exhibit and incorporated therein by reference.
That on or about March 16, 1966, the plaintiff was employed as a concrete mason for Arnold Construction Company, a contractor or subcontractor engaged in the construction of the airport, and was pouring concrete for a second floor of the airport building; that the plaintiff was at all times acting within the scope of his employment, working on a floor approximately twelve feet above the ground level, and was totally unprotected by a guard rail or any other type of device to prevent persons from falling to the ground from this height; that the defendants affirmatively *314 undertook and assumed the responsibility "as the Commission's representative at the work site, the Engineer-Architect-Consultant shall maintain direct supervision of the field activities of the Resident Project Representative(s), and through them he shall maintain direct supervision over the Contractor(s) in the prosecution of their work." (Exhibit A, ¶ 4, page 7); and further to "serve as the Commissioners' professional representative in all phases of the work" (Exhibit A, page 3); and further, to make "[d]aily visits to the construction site during construction * * * to observe the progress of the construction work, and to provide detailed instruction to the Resident Project Representative(s) * * * such instructions intended to provide proper prosecution of the construction work and supervision of the work of the appropriate contractor. Both of the above services to ascertain and assure that the construction work is progressing in strict accordance with the plans and specifications and the requirements of the funding and regulatory agencies * * *." The complaint further alleges that the defendants by affirmatively agreeing to the above affirmatively undertook and assumed the responsibility to direct the contractor in regard to the installation of guard rails, if they were not installed and to insure that the construction work was proceeding in accordance with all safety regulations promulgated and administered by the Florida Industrial Commission and all other applicable regulations and ordinances; that the failure to direct the installation of guard rails amounted to negligence by the defendants, which negligence consisted of failing to ascertain and insure that the construction work was proceeding in accordance with the safety regulations promulgated and administered by the Florida Industrial Commission's ch. 185S-6.08, which directs that in construction of this nature a floor such as the one described herein shall be guarded by guard rails on all open sides, said guard rails being more specifically described in ch. 185S-6.05; failing to make necessary inspections to assure that safe construction practices would be used; failing to require that guard rails be used during the construction of open floors with the knowledge that the failure to use the same would result in a dangerous condition likely to cause injury to persons such as the plaintiff; failure to enforce all applicable regulations, ordinances, including the Florida Industrial Commission's safety regulations; planning, designing and supervising the construction and installation of the hazardous condition with knowledge that the same would be used and worked on by persons such as the plaintiff; that at all times material hereto the defendants affirmatively undertook and assumed the duty of directing the installation of the guard rails in accordance with the safety regulations promulgated and administered by the Florida Industrial Commission's ch. 185S-6.08, which directs that in construction of the nature hereinbefore described, the floor hereinbefore described shall be guarded by guard rails on all open sides, said guard rails being more specifically described in ch. 185S-6.05; that the facts in regard to the assumption of this duty consisted of defendants or their agents, employees or representatives observing that guard rails were not being utilized on the job site in accordance with the aforesaid regulations of the Florida Industrial Commission prior to and at the time of the accident hereinafter described. Defendants or their agents, employees or representatives advised the contractors, the contractors' superintendents or the contractors' foremen prior to the accident that guard rails should be installed. Guard rails were not installed as directed by the defendants, and the defendants, or their agents, employees or representatives knew that the guard rails had not been installed. Defendants took no further action to see that the guard rails were installed, although they knew that as a proximate result of the failure to install guard rails a dangerous condition resulted, which was likely to cause injury to persons such as the plaintiff. Final allegations were to the extent that the defendants were negligent *315 in assuming the duty to direct the installation of guard rails and then negligently carrying out said duty; that as a result of the defendants' negligent failure to install a guard rail the plaintiff suffered a fall from the floor to the ground and as a result the plaintiff was injured in and about his body and extremities, suffered pain therefrom, incurred medical expense in the treatment of such injuries, suffered physical handicap and his working ability was impaired; that the injuries are either permanent or continuing in nature and plaintiff will suffer such losses and impairment in the future. Plaintiff demanded judgment for damages in excess of $1,000 against the defendants, and requested trial by jury.
Thereafter the defendants, John B. Marion and Ames Bennett, filed motion to dismiss plaintiff's fourth amended complaint and the Defendant-Marion also filed motion for summary judgment. The court simultaneously granted all the motions and entered final judgment in favor of both defendants. This appeal followed.
The trial court not only determined that the fourth amended complaint failed to state a cause of action and granted motions of both defendants to dismiss the complaint, but it also entered summary judgment on behalf of the defendant, John B. Marion. For the purposes of this appeal we will initially concern ourselves as to whether the fourth amended complaint states a cause of action sufficient to withstand a motion to dismiss, and secondly, whether there was no genuine issue as to any material fact so that the defendant, John B. Marion, was entitled to a judgment as a matter of law.
In testing the fourth amended complaint, it is the established rule that upon a motion to dismiss a complaint for failure to state a cause of action, all material allegations of the complaint are taken as true. A motion to dismiss a complaint must be decided on questions of law and questions of law only. The purpose of the motion to dismiss is to ascertain if the plaintiff has alleged a good cause of action, and the court when faced with a motion to dismiss a complaint for failure to state a cause of action must confine itself strictly to the allegations within the four corners of the complaint. Kest v. Nathanson, Fla.App. 1968, 216 So.2d 233; Thompson v. Safeco Insurance Company of America, Fla.App. 1967, 199 So.2d 113.
Although the question of an architect's liability for personal injury or death has not heretofore been determined in the State of Florida, law abounds in other jurisdictions to the effect that an architect who plans and supervises construction work as an independent contractor is under a duty to exercise ordinary care in the course thereof for the protection of any person who foreseeably and with reasonable certainty may be injured by his failure to do so. The following cases concern themselves with an architect's liability for negligent acts. Montijo v. Swift, 1963, 219 Cal. App.2d 351, 353, 33 Cal. Rptr. 133 (suit by pedestrian descending a stairway in a bus depot for injuries in a fall against the architect who planned and supervised the renovation and the reconstruction of the stairway; judgment for the defendant notwithstanding the verdict, reversed and order for new trial affirmed.) Willner et al. v. Woodward, 1959, 201 Va. 104, 109 S.E.2d 132 (suit by homeowners against architect for damages allegedly due to negligent plans, negligent approval of plans of others and negligent supervision of construction, relating to the heating and airconditioning system, the plans being inadequate and not requiring ducts to be encased in concrete and not providing a firewall, the architect not having inspected the ductwork and having relied on the design and system of the contractor; summary judgment for the defendant reversed and remanded.) Erhard v. Hummonds, 1960, 232 Ark. 133, 334 S.W.2d 869 (the owner employed the architects to draw up plans for a commercial building. That was done. The owner then employed the architects to supervise the *316 construction for an additional fee. There was no written contract between the architect and the owner. The general contractor subcontracted the excavation work to another party. The plans for excavation were in some detail in the contract. The walls had to be shored to prevent sliding and caving. The field supervisor for the architect raised questions about certain of the shoring. The architects asked the general contractor to send a new job superintendent. He arrived on a Friday and promised the shoring in question would be done on Monday. It rained over the weekend, and the excavation wall softened. On Monday as the field supervisor of the architect drove his car near the embankment wall, it caved in. Three employees of the subcontractor or contractor were killed and another injured. The architects were sued for the deaths and the injury. Judgments for the plaintiff were affirmed.)
The law applicable to an architect's liability for personal injury or death may be summarized as follows. An architect may be liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure whereby anybody lawfully on the premises is injured. Possible liability for negligence resulting in personal injuries may be based upon their supervisory activities, or upon defects in the plans or both. Their possible liability is not limited to the owner who employed them. Privity of contract is not a prerequisite to liability. They are under a duty to exercise such reasonable care, technical skill and ability, and diligence as are ordinarily required of architects in the course of their plans, inspections and supervisions during construction for the protection of any person who foreseeably and with reasonable certainty might be injured by their failure to do so.
We are of the conviction that under the applicable law, the allegations in plaintiff's fourth amended complaint are sufficient to withstand a motion to dismiss.
We next turn to the propriety of granting a summary judgment to the defendant, John B. Marion. As in other negligence actions, the question of liability cannot lawfully be withdrawn from the jury and determined by the court unless the facts are not only undisputed but are also such that all reasonable men in the exercise of fair and impartial judgment must draw the inference and conclusion therefrom of non-negligence. Leaks v. Adeimy, Fla. App. 1967, 195 So.2d 47.
An architect has been defined as one skilled in practical architecture, one whose profession it is to devise the plans and ornamentation of buildings or other structures and supervise their construction. An architect or engineer has also been defined as one whose special business it is to design buildings, fix the thickness of their walls, the supports necessary for the maintenance of them in their proper position, and do all other things in the line of his profession for the guidance of builders in the erection of buildings. Architecture is the art of building according to certain determined rules. 6 C.J.S. Architects § 1; 5 Am.Jur.2d, Architects § 1.
Decisions of other states make it clear that an architect is not under a duty to supervise construction. Payne v. DeVaughn, 1926, 77 Cal. App. 399, 246 P. 1069. However, architects do supervise as a matter of common practice. Peak v. Richmond Elementary School District, 1958, 161 Cal. App.2d 366, 326 P.2d 860, and such supervision is properly within the scope of their professional capacities. When architects do undertake supervision of construction in addition to the preparation of plans, they generally are compensated separately or additionally,[1] and if they perform their supervisory *317 duties in a negligent fashion their liability therefor is separate and distinct from the liability of the party who negligently performs the actual building process. Alexander v. Hammarberg, 1951, 103 Cal. App.2d 872, 230 P.2d 399.
In the instant case, the plaintiff attached to the complaint the contract executed by the defendant-architects and the other parties involved in the construction of the airport. The contract provided that the architects were to perform, among others, the following services (page 6 of the contract):
"2. Daily visits to the construction site during construction by a professionally qualified representative to observe the progress of the construction work, and to provide detailed instruction to the Resident Project Representatives as set forth in Exhibit `A' attached hereto and made a part hereof, such instructions intended to provide proper prosecution of the construction work and supervision of the work of the appropriate contractor. Both of the above services to ascertain and assure that the construction work is progressing in strict accordance with the plans and specifications and the requirements of the funding and regulatory agencies. It shall be the responsibility of the Engineer-Architect-Consultant to ascertain that the Contractor(s) are properly performing the work for which they have contracted, or in the event of failure to promptly and positively notify the Commission of the Contractor's failure to perform, and it shall further be the Engineer-Architect-Consultant's responsibility to keep the Commission informed of the progress of the work, or lack thereof, and to advise of deficiencies and delays and to provide recommendations for the correction and return to schedule."
The contract further provided at page 7:
"4. Consult with and advise the Commission during the progress of the construction phase, and act as the Commission's representative at the work site, and further to issue the instructions of the Commission to the various Contractors and prepare such Change Orders as may be required. As the Commission's representative at the work site, the Engineer-Architect-Consultant shall maintain direct supervision of the field activities of the Resident-Project-Representative(s), and through them he shall maintain direct supervision over the Contractor(s) in the prosecution of their work." (Emphasis added.)
There certainly are material issues of fact as to the duties imposed upon the architects under the contract term "supervision," particularly as that term relates to the taking of positive steps to insure the safety of workmen during the construction. Determination as to whether or not the architects *318 exercised those duties is properly within the realm of the jury.
Accordingly, the final judgment is reversed, plaintiff's fourth amended complaint is reinstated, and the cause is remanded for further proceedings consistent with the views herein expressed.
Reversed and remanded, with instructions.
WALDEN and REED, JJ., concur.
NOTES
[1] Agreement for Engineering-Architectural Services

Palm Beach International Airport Terminal Complex
"ARTICLE V.
"A. BASIC RATE FEE. The Commission shall pay the Engineer-Architect-Consultant for the basic services hereinbefore set forth a fee based on 6.5% of the contract construction cost, but not less than a total of $170,000, provided however that the work continues to completion of the construction phase. In the event the work is terminated prior to the completion of the construction phase the fee due the Engineer-Architect-Consultant shall be established as set forth in Article VI.
"B. FEE PAYMENTS. The Commission shall make payments to the Engineer-Architect-Consultant of the basic fee in the following manner:
"1. A primary payment of Thirteen Thousand Dollars ($13,000) for basic services shall be paid at the time of the execution of this Agreement, and in the event work is discontinued, abandoned or suspended at any point through no fault of the Engineer-Architect-Consultant, this is to be the minimum payment to the Engineer-Architect-Consultant.
"2. Subsequent basic fee payments shall be allowable and payable in the following percentages at the following points of progress:

 "Upon completion of Preliminary
 phase .......................... 35%
 Upon completion of Design
 Phase .......................... 80%
 Upon completion of Final
 Construction Inspection ....... 100%"