Clem (Cleam) CALDWELL, Appellant,

v.

BECHTEL, INC., Appellee.

No. 79–1007.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 21, 1979.

Decided Aug. 19, 1980.

---

992

David L. Hilton, Washington, D. C., with whom Irwin Miniberg, Washington, D. C., was on brief, for appellant.

Gary W. Brown, Washington, D. C., with whom James C. Gregg and Ellen A. Patterson, Washington, D. C., were on brief for appellee.

Before McGOWAN, MacKINNON and WALD, Circuit Judges.

Opinion for the Court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

We are here concerned with a claim for damages by a worker who allegedly contracted silicosis while he was mucking in a tunnel under construction as part of the metropolitan subway system. The basic issue is whether a consultant engineering firm owed the worker a duty to protect him against unreasonable risk of harm.

The Shea–S&M–Ball joint venture (hereinafter Shea) entered into a contract with the Washington Metropolitan Area Transit Authority (hereinafter WMATA) in the construction of tunnels for the Washington Metro Subway system and appellant Clem Caldwell was employed by Shea as a heavy equipment operator. Appellee Bechtel, Inc. (hereinafter Bechtel) was also under contract with WMATA, as a consultant to provide, *inter alia*, "safety engineering services" with respect to work to be done by various contractors pursuant to their contracts with WMATA. Among the duties that Bechtel undertook to perform for and on behalf of WMATA under the contract between the parties was the function of overseeing the enforcement of safety provi-

sions in relevant safety codes, and inspecting job sites for violations.

■ Appellant brought suit in district court against several defendants, only one of which, his employer Shea, has not been dismissed by summary judgment in the district court.[1] This appeal attacks the district court's grant of defendant Bechtel's motion for summary judgment. Accordingly in this decision we must construe appellant's complaint against Bechtel in the light most favorable to him, accepting as true his allegations of fact. *Melancon v. Insurance Company of North America*, 482 F.2d 1057 (5th Cir. 1973); *Overseas Media Corp. v. McNamara*, 385 F.2d 308 (D.C.Cir.1967).

The essence of Caldwell's complaint is that Bechtel "had the function, duty and responsibility, as consultant to Metro [WMATA] to provide, *inter alia*, overall direction and supervision of safety measures and regulations in effect, or needed during the course of construction . . ." (App. 5), and that Bechtel was aware or should have been aware of the danger posed by high levels of silica dust and inadequate ventilation in the Metro tunnels, but failed to take the steps it was duty–bound to take to rectify the situation. This failure, Caldwell alleges, was not only in violation of Bechtel's contract with WMATA and applicable safety codes, but more importantly constituted gross negligence toward Caldwell who was working in the tunnels.

■ While we must accept Caldwell's allegations of fact, we will closely examine his version of the law, since it stands in contradiction to the district court's conclusion "that the WMATA–Bechtel Contract created no duty owed plaintiff by defendant the breach of which would give rise to plaintiff's action for negligence." (App. 172). The issue in this case, then, is whether the contractual authority vested in Bechtel with respect to job site safety regulations created a special relationship between Bechtel and Caldwell under which Bechtel owed a duty to Caldwell to take reasonable steps to protect him from the foreseeable risk to his health posed by the dust laden Metro tunnels. We find that under applicable tort law principles Bechtel was indeed duty–bound. Accordingly, we reverse the decision of the district court.

I

From February 1972 until his termination in July of 1973, appellant was an employee of Shea, and worked as a heavy equipment operator in connection with the contract between Shea and WMATA for construction of subway tunnels. Caldwell's specific job was to operate a large front–end loading mucker machine to remove debris blasted from the face of the tunnel and transport it to the head of the tunnel in a process known in the industry as mucking. During the period of Caldwell's employment, Bechtel was under contract with WMATA to

1. Appellant was awarded compensation for job–incurred silicosis under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 901, *et seq.* incorporated in the law of the District of Columbia in 36 D.C.Code § 36–501.

Appellant then filed suit charging negligence by (1) the Occupational Safety and Health Administration (OSHA); (2) the National Loss Control Service Corporation (NLCSC); (3) Bechtel, Inc. for failing to adequately enforce, rectify, implement and direct proper safety standards at the project site. Appellant also sued his union, (4) the International Union of Operating Engineers, Local No. 77, for alleged failure to fairly represent him in his grievances about safety conditions. Lastly, appellant charged his employer, (5) the Shea–S&M–Ball joint venture, with unlawful conspiracy with the union to prevent assertion of his grievances

and to have him discharged. Memorandum and Order of the District Court at 1, 2, C.A. No. 75–1025 (October 28, 1978).

By Memorandum and Order of February 3, 1978, the District Court granted the government's motion to dismiss OSHA and granted the NLCSC's motion for summary judgment. By Memorandum and Order dated March 10, 1978, the District Court granted summary judgment to the union on grounds that appellant had failed to exhaust his internal union remedies. Caldwell appealed from the latter order, and the case was consolidated with the Bechtel case. By a separate order issued today, we affirm the District Court's summary judgment for the union in No. 78–1584. Appellant's suit against Shea is pending below, and we today rule in his favor against defendant Bechtel on its obligation to protect him from unreasonable risk of harm.

manage and supervise work done by various contractors working for WMATA and to oversee safety procedures (App. 168–9). Most relevantly, Bechtel had the duty to monitor and inspect the job site and to ensure, as defined, that the contractors, including Shea, complied with all safety codes in force. (App. 121, 142).

According to appellant, shortly after beginning work in the tunnel he noticed that the dust was so heavy that it filled his nose and mouth, and he developed a cough and began to spit up blood. Since his claims against OSHA, NLCSC and the International Union have been dismissed, *see* note 1, *supra*, Caldwell's allegations against them are immaterial here, but Caldwell essentially recounts that although he made repeated complaints to "his employer, to OSHA, to his union representatives and construction supervisors," (App. 6), about the unsafe conditions, he received no remedial response from any of the defendants and the working conditions of which he complained were never corrected. Appellant was finally terminated by his employer Shea on grounds of making frivolous safety complaints. After a one–day strike by his union, he was offered his job back. Appellant declined the offer, however, because this would have necessitated reentry into the pervasive dust of the tunnels, and he was already suffering from a pulmonary problem that was later diagnosed as silicosis.

At trial appellant would introduce evidence that in September of 1972, an industrial hygienist attempted to gain entrance to the tunnel in which appellant worked, for the purpose of taking air samples, but was barred admission to the tunnel by the Project Manager for Shea. The hygienist appealed to Bechtel for assistance, but was not allowed to conduct tests until December of 1972, when, under controlled conditions, the silica dust was found to be in excess of a safe level. Subsequent tests continued to show the existence in the tunnels of silica dust above an unsafe threshold. Appellant would also allege that during the time he was working in the tunnel and complaining of the atmospheric conditions, Bechtel failed to comply with its contractual duty to use its best efforts to persuade Shea to correct the unsatisfactory conditions and, when conditions remained unsafe, failed in its authorized duty to order a work stoppage until said conditions were corrected. Allegedly Bechtel did not use its best efforts to attempt to persuade Shea to comply with the following safety precautions: allowing workers to wait an appropriate time to return to the tunnel after a blast; requiring that the muck pile be wetted down; and requiring that the fan lines be in operational condition to furnish fresh air to the face of the tunnel. Caldwell generally contends that Bechtel completely failed to comply with the safety provisions as set forth in its contract with WMATA, to which we now turn.

Bechtel's contractual duties to WMATA,[2] beyond its responsibility for general supervision of all Metro construction, included supervision of safety at the various construction sites. Bechtel was designated a "consultant" by the contract. Section 2(9) provides:

*Safety*

Consultant shall provide safety engineering services as required to ensure compliance with the provisions of the Metro Construction Safety Manual, the Metro Coordinated Safety Program and Reporting Procedures and other applicable codes, and the contractual obligation of the Authority's contractors, and shall direct the contractor to correct any unsatisfactory condition which may be detected. Consultant shall also provide safety engineering services which will be coordinated with the Authority's insurance representatives to develop and ensure a uniform system of safety and accident prevention procedures including reporting

---

**2.** Bechtel negotiated annual contracts with WMATA for the years 1972 and 1973. The district court memorandum recorded that the parties agreed that "slight linguistic differences" in the two contracts were of no consequence in the determination of the case. Dt.Ct. Mem. and Order at 7, n.6.

requirements. These reporting procedures will be applicable to all construction contracts. Consultant shall adhere to the procedures contained in the Authority's Coordinated Safety Program and Reporting Procedures.

The contract defined certain terms contained therein:

*Definitions*

Wherever in the Scope of Services the words "assist, direct, ensure, or require" appear it is intended to mean that it is the obligation of the Consultant to use his best efforts to persuade the Construction Contractors to comply with all the provisions of their contracts with the Authority and, if this fails, to bring the matter promptly to the attention of the Contracting Officer for his action.

These definitions have the effect of turning words whose customary meaning indicates that corrective action must be accomplished by Bechtel into words that only require Bechtel to attempt to get others to correct the unsatisfactory conditions. It is significant, however, that there is nothing in the contract that lessens Bechtel's authority to *order* a work stoppage until such time as unsafe conditions are corrected. *See infra.* The normal authority implicit in the word "order" is not diminished by contractual definition.

The "Metro Construction Safety Manual", which it was Bechtel's duty to enforce under Section 2(9) of the contract, refers to the Washington Metropolitan Area Transit Authority Safety Manual (hereinafter Safety Manual), which was in effect at the time the contract was executed. Among the requirements of the Safety Manual is the stricture that "[no] man shall be required to work in an unsafe place." (App. 134). The Safety Manual was supplemented in 1972 by the WMATA Coordinated Safety Program and Reporting Procedures (hereinafter Safety Program) under which Bechtel's duties with respect to safety were further defined.

The Safety Program required Bechtel to maintain a Resident Engineer at the job site, and required the Resident Engineer to:

(1) "diligently oversee" the contractor's assumption of responsibility for safety procedures.

(2) "report on any unsafe working conditions".

(3) follow a prescribed procedure if he found it necessary to notify the contractor in writing of noncompliance with any of the safety regulations. Following transmission of such reports, the Resident Engineer was to be advised of the action to be taken.

(4) notify several offices and agencies in the event an individual was continually and deliberately violating safety requirements. Authority to remove individuals whom it found to be incompetent, careless or objectionable was vested in the contracting officer; *the Resident Engineer, in addition to the contracting officer, was "authorized to order a work stoppage if unsafe conditions exist until such time as the condition is corrected."*

(5) receive and monitor copies of the contractor's daily safety inspection reports and atmospheric logs.

(App. 142). (Emphasis added).

## II

The district court's determination that Bechtel did not owe Caldwell a duty of due care is premised upon two grounds. The court first analyzed the WMATA–Shea contract and the WMATA–Bechtel contract side by side. The court read the WMATA–Shea contract to place a non–delegable duty to ensure the safety of its employees upon Shea, and found that the WMATA–Bechtel contract only created an obligation in Bechtel to "supervise, to report and to persuade" Shea into compliance, without investing it with "power to compel" such compliance,[3] which it found "lay with WMATA".

---

3. We find, to the contrary, that Bechtel's Resident Engineer was "authorized to order a work stoppage if unsafe conditions exist until such time as the condition is corrected." App. 142. Metro Coordinated Safety Program and Reporting Procedures.

In so interpreting Bechtel's contractual duties it read out of existence Bechtel's authorization "to order a work stoppage" when necessary to carry out its duties with respect to enforcing safety regulations. It reached this result by asserting: ". . . when read in the light of all the other provisions concerning safety which clearly contemplate that Bechtel would do nothing until it first attempted compliance by persuasion, even the [authority to order a work stoppage] . . . loses its force." (App. 171). This extends the application of the limiting provisions of the "Definitions" section, *supra*, beyond their terms, ignores the express provision authorizing Bechtel "to order a work stoppage" and in our view is a construction that is unjustified by the express terms of the contract. Furthermore, it would leave the most knowledgeable and skillful expert in the field without any effective authority.

For its second ground, the district court relied verbatim upon the analysis of the court in *Beesley v. Bechtel*, C.A. No. 76–0810 (D.D.C. May 4, 1978), which assertedly ruled on "contracts virtually indistinguishable from those in this case". The district court in *Beesley* also found that primary responsibility for the safety of workers rested with the contractor in that case. And the court additionally determined that Bechtel (also the defendant in *Beesley*) owed plaintiff no *contractual* duty, express, implied or as a third party beneficiary, and therefore could not "be held accountable for any alleged breach of its contractual obligations." Dist.Ct.Mem. and Order at 11, 12.

In its brief before this court, appellee Bechtel defends along similar lines. Once it had reported high dust levels to WMATA, Bechtel maintains, its authority was preempted.[4] Bechtel contends that it met its contractual obligations, and that in any event it owed no contractual duty to appellant.

■ In support, Bechtel cites several cases in which courts have declined to assess liability against the United States for its alleged negligence in failing to inspect work sites and enforce safety codes. In these cases, the U.S. government had contracted with private contractors to construct projects for its use, but reserved the right to inspect the work site and monitor the contractors' compliance with safety provisions. *See, e. g. United States v. Page*, 350 F.2d 28 (10th Cir. 1965), *cert. denied*, 382 U.S. 979, 86 S.Ct. 552, 15 L.Ed.2d 470 (1966). A worker of the contractor, having been injured, would bring suit against the government under the Federal Tort Claims Act, but the courts held that the employee could not recover against the government since it had no control over employees of the independent contractor, and while the government had a right to enforce safety provisions, no duty to do so was created that would give an employee a cause of action for the breach of such a duty. *See also Craghead v. United States*, 423 F.2d 664 (10th Cir. 1970) and *Lipka v. United States*, 369 F.2d 288 (2nd Cir. 1966), *cert. denied*, 387 U.S. 935, 87 S.Ct. 2061, 18 L.Ed.2d 997 (1967).[5]

■ In our view, the analysis of both Bechtel and the district court is overly reli-

---

4. *See note 22 infra.*

5. There was no finding in these cases that the government had knowledge of the dangerous working conditions that caused the accident. This fact alone, however, we do not deem sufficiently controlling to distinguish them from the instant case. In truth, then, the distinction is one of approach. The court in *Page* relied upon "[t]he general rule of non–liability for the torts of the contractor because no duty is created to employees or third parties," and found that since the government had not assumed control over the employees of the contractor, it

could not be held liable in the place of the contractor. 350 F.2d at 30, 31.

Here, on the other hand, we do not share the view that Bechtel owes no duty to workers because it did not function in the place of the contractor, and did not possess sole or necessarily primary responsibility for the safety of workers. Rather, we look to the contractual duties that Bechtel *did* assume, and to the superior skills WMATA contracted for Bechtel to bring to its undertaking as construction and safety consultant, and find therein the basis that created its duty to exercise due care. *See* n.21 *infra.*

ant upon contract theory to the point of losing focus of the nature of the claim made here, which asserts negligence, rather than breach of contract. It has been many years since courts required privity of contract between the plaintiff and defendant before assessing tort liability, yet Bechtel would return us to that distant day.[6] The duties that Bechtel undertook in its contract with WMATA are relevant to this case, not because they illustrate Bechtel's point that a contractual duty was owed only to WMATA, but because by assuming a contractual duty to WMATA, Bechtel placed itself in the position of assuming a duty to appellant in tort. The particular circumstances of this case, including the Bechtel–WMATA contract, Bechtel's superior skills and position, and Bechtel's resultant ability to foresee the harm that might reasonably be expected to befall appellant, created a duty in Bechtel to take reasonable steps to prevent harm to appellant from the hazardous conditions of the subway tunnels.

### III

In attempting to convince the court that it owes no duty of reasonable care to protect appellant's safety, Bechtel argues that by its contract with WMATA it assumed duties only to WMATA.[7] Appellant has not brought this action, however, for breach of contract but rather seeks damages for an asserted breach of the duty of reasonable care. Unlike contractual duties, which are imposed by agreement of the parties to a contract, a duty of due care under tort law is based primarily upon social policy.[8] The law imposes upon individuals certain expectations of conduct, such as the expectancy that their actions will not cause foreseeable injury to another. These societal expectations, as formed through the common law, comprise the concept of duty.

Society's expectations, and the concomitant duties imposed, vary in response to the activity engaged in by the defendant. If defendant is driving a car, he will be held to exercise the degree of care normally exercised by a reasonable person in like circumstances. Or if defendant is engaged in the practice of his profession, he will be held to exercise a degree of care consistent with his superior knowledge and skill.[9] Hence, when defendant Bechtel engaged in consulting engineering services, the company was required to observe a standard of care ordinarily adhered to by one providing such services, possessing such skill and expertise.[10]

A secondary but equally important principle involved in a determination of

---

**6.** *See, e. g.*, the landmark case of *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050, 1053 (1916).

> We have put aside the notion that the duty to safeguard life and limb, when the consequences of negligence may be foreseen, grows out of contract and nothing else.

*See also* 57 Am.Jur.2d §§ 49, 50 (1971) at 398.

**7.** Bechtel also maintains that it owed appellant no duty to protect him against risk of harm since appellant was an incidental, rather than an intended third party beneficiary under the WMATA–Bechtel contract. Yet, even the question of whether appellant was an intended third party beneficiary is debatable. Certain provisions of the WMATA–Bechtel contract might be construed to indicate an intent to benefit construction workers such as Caldwell. For instance, Bechtel contracted to supervise compliance with the provisions of the Safety Program and the Safety Manual, which are written in terms strongly protective of the workers' right to a safe working environment. It might thus be ventured that Caldwell was an intended third party beneficiary of the WMA-

TA–Bechtel contract. We need not decide this issue, however, since Caldwell sues not to enforce any alleged rights under the contract, but for relief in tort. We accordingly base our opinion upon principles of duty owed in tort law.

**8.** *See generally* W. Prosser, *Handbook of the Law of Torts*, § 92 (4th ed. 1971).

**9.** *Id.* § 32.

**10.** *Cf. Geer v. Bennett*, 237 So.2d 311, 316 (Fla. App.1970), in which the court analyzed the duty of a supervising architect:

> They are under a duty to exercise such reasonable care, technical skill and ability, and diligence as are ordinarily required of architects in the course of their plans, inspections and supervisions during construction for the protection of any person who foreseeably and with reasonable certainty might be injured by their failure to do so.

duty is to whom the duty is owed. The answer to this question is usually framed in terms of the foreseeable plaintiff, in other words, one who might foreseeably be injured by defendant's conduct. This secondary principle also serves to distinguish tort law from contract law. While in contract law, only one to whom the contract specifies that a duty be rendered will have a cause of action for its breach, in tort law, society, not the contract, specifies to whom the duty is owed, and this has traditionally been the foreseeable plaintiff.

It is important to keep these differences between contract and tort duties in mind when examining whether Bechtel's undertaking of contractual duties to WMATA created a duty of reasonable care toward Caldwell. Dean Prosser expressed the relationship in this terse fashion:

> [B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of another person.[11]

A variety of state courts have applied similar principles in finding that a supervising architect [12] under contract with the owner of a construction project owed a duty of due care to employees of a subcontractor also working on the project. In one illustrative case, *Cutlip v. Lucky Stores,*

*Inc.,* 22 Md.App. 673, 325 A.2d 432 (1974), the plaintiff had been employed by a subcontractor under contract to build the structural steel for a Lucky Department Store. Lucky had also hired an architectural firm to design and supervise the construction, under a contract calling for "periodic inspection and supervision" and giving the architect the authority to stop construction. Plaintiff was killed when a portion of the store collapsed, and his wife brought suit against, among others, the architectural firm.

Addressing the question of whether the architectural firm owed a duty to the public because it was foreseeable that someone might be injured as a result of safety violations, the court stated that

> [t]he entire effort of government to provide safety regulations and procedures is aimed at preserving human life and protecting the public from harm. It would not seem unreasonable to expect that a professional architect who designs and retains supervision of the construction of a building to be used by the public might be expected to perceive a risk of injury to a member of the public in the event of negligent design or supervision of the very foundation members of the structure.

325 A.2d at 443. But the court declined to base its decision solely upon such a duty to the public, pointing instead to specific contractual duties that the architect had undertaken, such as a commitment to inspect and report on the work to the County, and ruling that these commitments "clearly subjected [the architect] to a duty which encompassed the decedent". The court con-

---

11. W. Prosser, *supra*, § 93 at 622.

> In the same vein, 57 Am.Jur.2d § 50 at 399 (1971) states:
> Where one undertakes by contract to perform a certain service and is chargeable with the duty of performing the work in a reasonably proper and efficient manner and injury occurs to a blameless person, the injured person has a right of action directly against the offending contractor which is based not on any contractual obligation but rather on the failure of such contractor to exercise due care in the performance of his assumed obligation.

12. Architects, engineers and construction managers have been treated similarly for the purposes of assessing duty. Bell, "Professional Negligence of Architects and Engineers" at 173 in Roady and Anderson, *Professional Negligence* (1960); Sweet, "Site Architects and Construction Workers: Brothers and Keepers or Strangers?" 29 *Emory Law Journal* 291, 327 (1979). More important than the label, we think, is an evaluation of contractual duties, special skills and knowledge, and the concomitant duties of due care.

cluded "that the supervisory authority given [the architect] under his contract when coupled with his inspection and notice commitments to the County, were sufficient to allow him to perceive the danger implicit in neglectful construction, at the very least to an employee in the hazardous field of structural steel erection, if indeed not to the public for whose use the structure was intended". 325 A.2d at 444.

In *Simon v. Omaha Public Power District*, 189 Neb. 183, 202 N.W.2d 157 (1972), the Nebraska Supreme Court looked first to the defendant consulting engineer's contractual duties and then disclaimed any reliance upon the contract as the source of the defendant's duty of due care to the injured worker. The court stated:

> It is true that for a mere breach of his contract with his principal an agent is only liable to his principal but in his undertakings the agent must have due regard for the rights and safety of third persons. If in the course of his agency he undertakes as a part of his contract to render service to his principal of a type which he should recognize as necessary for the protection of third persons, he must exercise reasonable care in the performance of the undertaking. *It is not the contract which gives rise to the duty nor is the standard of care increased or diminished by the status as agent, it is his common–law obligation to do that which he undertakes so as not to injure another.*

202 N.W.2d 157 at 168. (emphasis added).

Other cases cited by appellant are based on similar facts, and reach similar conclusions concerning the duty of a supervising architect or consulting engineer toward employees of a contractor who foreseeably might be injured by the architect's malperformance of his contractual undertakings.

In none of the cases is privity of contract between the architect and employee required, although there is differing reliance upon the duties owed by the architect to the owner of the project. Foremost among those contract terms considered important by the courts is the authority to stop work on the project,[13] and the courts also frequently stress that the architect had knowledge of the dangerous condition that occasioned the accident.[14]  *See Swarthout v. Beard*, 33 Mich.App. 395, 190 N.W.2d 373 (1971) *rev'd on other grounds*, 388 Mich. 637, 202 N.W.2d 300 (1972) (Michigan Supreme Court reversed Appellate Court's grant of a new trial on the issue of damages); *Geer v. Bennett*, 237 So.2d 311 (Fla. App.1970); *Miller v. DeWitt*, 37 Ill.2d 273, 226 N.E.2d 630 (1967); *Erhart v. Hummonds*, 232 Ark. 133, 334 S.W.2d 869 (1960).[15]

These cases illustrate that courts have primarily premised an extension of liability to the site architect upon its contractual undertaking on behalf of the project owner, and upon the resultant foreseeability of injury to workers in the event that the undertaking is negligently performed. We endorse this interpretation of the interrelationship of contractual duties owed to one party upon possible duty in tort owed to another party, and find it applicable to the facts at hand. Before making this application, however, we find it equally helpful to refer to an analogous line of cases in which defendants have been found to owe a duty to a plaintiff because of a special relationship between either the defendant and a third party, or defendant and plaintiff.

Analyzing the common law, Prosser noted that courts have found a duty to act for the

---

**13.** *But see Simon v. Omaha Public Power District. supra*, in which the court made no finding to contradict defendant's claim that it had no authority to stop work on the project. Nor in *Geer v. Bennett*, 237 So.2d 311 (Fla.App.1970) was mention made of authority to stop work.

**14.** *But see Miller v. DeWitt*, 37 Ill.2d 273, 226 N.E.2d 630 (1967), in which there was no finding that the architect had knowledge of the

dangerous conditions existing before the accident.

**15.** For a discussion of cases that predate these, as well as those in which courts reach the contrary conclusion that no duty on the part of supervising architects exist, *see* Sweet, "Site Architects and Construction Workers: Brothers and Keepers or Strangers?" 28 *Emory Law Journal* 291, 297–318 (1979).

protection of another when certain relationships exist, such as carrier–passenger, innkeeper–guest, shipper–seaman, employer–employee, shopkeeper–visitor, host–social guest, jailor–prisoner, and school–pupil.[16] These holdings suggest that courts have been eroding the general rule that there is no duty to act to help another in distress,[17] by creating exceptions based upon a relationship between the actors.[18]

A recent example of this trend occurred in *Tarasoff v. Regents of University of California*, 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334 (1976). In *Tarasoff*, a psychologist was informed by one of his patients that he intended to kill a certain third person. Although the psychologist notified the campus police, who briefly detained the patient, the intended victim was not warned, and the patient then carried out his stated intention.

Justice Tobriner, speaking for the California Supreme Court, recognized that while the common law generally created no duty to warn someone endangered by the conduct of another, "the courts have carved out an exception to this rule in cases in which the defendant stands in some special relationship to either the person whose conduct needs to be controlled or in a relationship to the foreseeable victim." 551 P.2d at

343. The court found such a relationship to exist between the psychologist and his patient, and held that a therapist, once he determines or should determine[19] that a patient poses a serious danger of violence to another, has a duty to exercise reasonable care to protect the foreseeable victim from that danger.[20]

We find that case law provides many such analogous situations from which the principles deserving of application to this case may be culled. The foregoing concepts of duty converge in this case, as the facts include both the WMATA–Bechtel contractual relationship from which it was foreseeable that a negligent undertaking by Bechtel might injure the appellant, and a special relationship established between Bechtel and the appellant because of Bechtel's superior skills, knowledge of the dangerous condition, and ability to protect appellant. We thus look to the relevant facts.

### IV

The first component of the duty that Bechtel owed to appellant takes as its point of departure Bechtel's contractual duties to WMATA. In discussion of these contractual provisions we are not unmindful of the limited meanings the contract gives to some

---

**16.** W. Prosser, *supra*, § 56, at 341–2.

**17.** The general rule stems in part from the common law's reluctance to premise liability upon a defendant's *nonfeasance* or *non–action*. The law required that a defendant commit misfeasance, *i. e.*, engage in negligent *conduct*, before liability would be assessed. W. Prosser, *supra*, § 56 at 340.

**18.** W. Prosser, *supra*, § 56 at 341; Sweet, *supra* at 295.

**19.** The ruling has been criticized as impracticable by the medical profession because the court included the duty to determine *whether* a patient poses a serious danger to a foreseeable victim. Justice Mosk, concurring, 551 P.2d at 353, would have limited the holding to the facts of the case in which the psychologist allegedly did determine that his patient posed a serious danger to the plaintiff.

In the case before us, defendant Bechtel allegedly had *knowledge* of the high level of silica dust, and presumably, of the hazard this high concentration constituted to the plaintiff. While we feel that in some respects this

strengthens plaintiff's case against Bechtel (and may be relevant to a determination of breach of duty) we do not by implication decide that Bechtel should not be held to a duty to determine whether the silica dust created a health hazard. Such a determination fits within the contractual undertaking of Bechtel to WMATA and also might reasonably be considered to be within the scope of its duty to the workers under the reasoning elaborated in this opinion. *See infra.* We note additionally that a determination of the dangerousness of a person, as in *Tarasoff*, would seem to involve a higher degree of conjecture than a determination of the hazards posed by certain silica concentrations in the Metro tunnels.

**20.** *See* Note, "Untangling Tarasoff: *Tarasoff v. Regents of the University of California*," 29 *Hastings Law Journal* 179 (1977), finding the reasoning of this case to be within the "mainstream" of California's legal concepts of duty because based upon the *special relationship* between the psychologist and his patient.

words by its "Definitions," *supra.* Under the contract Bechtel was to provide:·

safety engineering services as required to ensure compliance with the provisions of the Metro Construction Safety Manual, the Metro Coordinated Safety Program and Reporting Procedures and other applicable codes, and the contractual obligation of the Authority's contractors, and [Bechtel] shall direct the contractor to correct any unsatisfactory condition which may be detected.

Bechtel was also "to develop and ensure a uniform system of safety and accident prevention procedures including reporting requirements." (App. 168).

Several duties are encompassed in these contractual terms. First, Bechtel was charged to ensure compliance with the Safety Manual, which included among its admonitions that "[n]o man shall be required to work in an unsafe place". Second, Bechtel's contract directed Bechtel's Resident Engineer to "report on unsafe working conditions" and to receive and monitor copies of the contractor's daily safety inspection reports and atmospheric logs, and gave the Resident Engineer authority to order work stopped "if unsafe conditions exist until such time as the condition is corrected". (App. 142).

■■■ Third, Bechtel was to ensure, as defined, that the other contractors on the job obeyed safety requirements and fulfilled their contractual obligations to WMATA.[21] One such duty owed by Shea to WMATA was to ensure "that the methods of performing the work do not involve undue danger to the personnel employed thereon . . .." (App. 165). And the responsibility fell to Bechtel to "direct [as defined] the contractor to correct any un-

satisfactory condition which may be detected." (App. 168).

■■■ While the Bechtel–WMATA contract requires only that Bechtel use its "best efforts to persuade [Shea] . . . to comply" with safety regulations (App. 168) and thus Bechtel would not be absolutely liable to WMATA in the event of a safety violation, we are not only concerned with assessing Bechtel's duties to WMATA. Rather, the significance of the Bechtel–WMATA contract is that once Bechtel undertook responsibility for overseeing safety compliance, it assumed a duty of reasonable care in carrying out such duties that extended to the workers on the site.[22]

In the case that forged the limits of the common law concept of duty, *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99 (1928), Chief Judge Cardozo declared that "the orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of duty". Further emphasizing the relationship between the plaintiff and one properly named as defendant in such a case, he added: "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." 248 N.Y. at 343, 344, 162 N.E. at 100.

■■■ With these time–honored principles in mind, we have no difficulty in concluding that appellant was "within the orbit of danger" and hence within "the orbit of duty" owed by Bechtel. Among Bechtel's safety engineering services was the monitoring of atmospheric logs, as well as its more generalized duty to ensure that "[n]o man [worked] in an unsafe place". These duties thus focused upon safety in the workplace —appellant's place of employment. The

---

**21.** We reject the district court's conclusion that because primary responsibility for safety fell to Shea, Bechtel could not be liable in tort to appellant. Shared responsibility for safety arising out of contract, as here, poses no barrier to liability of the supervising agent. *See, e. g., Erhart v. Hummonds, supra,* 334 S.W. at 872. While Bechtel's duty in tort to appellant should be considered relative to the circumstances, more than one party can owe a duty in a given set of circumstances, and Bechtel's

duty is to be judged here on the basis of *its* relation to the circumstances.

**22.** Any argument that in fact Bechtel used its best efforts to ensure safe working conditions goes, of course, to the merits and we express no opinion on that point. We do hold, however, that merely notifying WMATA and the contractors of the problems in the tunnel would not necessarily extinguish a duty owed in tort.

primary workplace of course was the system of Metro tunnels under construction, the source of calculable danger to those employed there. If unsafe conditions were allowed to exist in the tunnels, injury to those engaged in the construction process was foreseeable. This was especially true since the tunnels were shown by atmospheric testing to contain a dangerous level of silica dust. Hence, Bechtel should be held to a duty to perceive and take reasonable steps to rectify the unreasonable risk posed by the hazardous conditions, and the company's duty extends to the protection of the workers, who were, we conclude, foreseeable victims of that danger.

■ The second component of duty owed by Bechtel is not entirely distinct from the first, since it too is premised in part upon the contractual relationship between Bechtel and WMATA. The contract provides an initiating source of duty, since Bechtel was on the job site, and in charge of safety engineering, because of its contractual duties. Bechtel's presence upon the site signified more than mere fulfillment of contractual duties, however; Bechtel possessed a status that transcended its contractual purposes. Bechtel was the safety engineer on the site, and as such

assumed a special relationship to the workers also on the job site. Not only was Bechtel armed with contractual ability to inspect for safety violations *and to stop work*, it also possessed the special skills of one engaged in the profession of safety engineering. Additionally, Bechtel was informed of the high concentration of silica dust and inadequate ventilation in the subway tunnels.[23] It is apparent then that Bechtel was fully possessed of the power to protect appellant, and stood in a superior position from which to do so. To an equal degree, therefore, we rely upon the special relationship[24] formed between Bechtel and appellant as grounds for the imposition of a duty on the part of Bechtel to take steps reasonable under the circumstances to protect appellant from the foreseeable risk of harm posed by the unsafe level of silica dust.

## V

We reverse the summary judgment of the district court, and hold that as a matter of law, on the record as we are required to view it at this time, Bechtel owed Caldwell a duty of due care to take reasonable steps to protect him from the foreseeable risk of

---

**23.** In fact, Bechtel argued that it was powerless to resolve the issue once these conditions were brought to the attention of WMATA, OSHA and Shea (App. 91). This indicates that Bechtel had knowledge of the dangerous conditions.

**24.** Professor Sweet, one of the nation's leading experts in the field of construction law, proposes that the architect or construction manager be held to a duty to construction workers because of his status, or special relationship.

> An architect who has contracted to perform traditional site services owes a duty to construction workers. This duty does not depend upon the architect's having particularly broad powers, such as the power to supervise, direct or stop work, an emphasis mistakenly employed in some of the seminal cases. Nor can the duty be completely negated by the architect's contract. The duty arises from the simple fact that architects and construction workers are coparticipants in a dangerous enterprise. They are both physically on the site, often at the same time. Each would expect the other to act when danger surfaces. They are *not* strangers.

29 *Emory Law Journal, supra,* at 327.

While there is some intimation in the foregoing passage that Professor Sweet relies less upon the contractual duties of the defendant architect or construction manager than we do, the Professor does define the duty of the architect in his conclusion to be: "to take reasonable steps, *as judged by his contract,* to discover unsafe practices and contract deviations which expose workers to an unreasonable risk of harm." *Id.* at 334 (emphasis added). Hence, while we generally agree with Professor Sweet that the status of an architect or construction manager on the site creates the duty to construction workers, we also believe that the scope of the duty cannot totally be divorced from the architect's contractual undertaking. We note this not to imply that such a duty in tort can be fundamentally changed by denying responsibility when drafting a contract, but rather upon the belief that the actual scope of duties for safety, supervision, etc., assumed in the contract will be apparent, and will also be a reflection of the superior abilities brought by the engineer or architect to the site. This in turn will influence the standard of duty.

harm to his health posed by the excessive concentration of silica dust in the Metro tunnels. We remand so that Caldwell will have an opportunity to prove, if he can, the other elements of his negligence action.

*Judgment accordingly.*