Charles E. PRESLEY and Victoria
D. Presley, Appellants/Cross–
Appellees,

v.

COMMERCIAL MOVING & RIGGING,
INC. and CMR Leasing, Inc.,
Appellees/Cross–Appellants,

and

Jacobs Engineering Group, Inc., Jacobs
Facilities, Inc. f/k/a Sverdrup Facili-
ties, Inc., and CRSS Constructors,
Inc., Appellees.

Nos. 07–CV–341, 07–CV–399.

District of Columbia Court of Appeals.

Argued March 26, 2009.

Decided July 28, 2011.

D. Stephenson Schwinn and David B. Stratton, Washington, DC, for appel-

lants/cross-appellees Charles E. Presley and Victoria D. Presley.

J. Michael Hannon, Washington, DC, for appellees/cross-appellants Commercial Moving & Rigging, Inc. and CMR Leasing, Inc.

Richard H. Kuhlman, with whom James D. Griffin and Thomas S. Schaufelberger, Washington, DC, were on the brief, for appellees Jacobs Engineering Group, Inc., Jacobs Facilities, Inc. f/k/a Sverdrup Facilities, Inc., and CRSS Constructors, Inc.

Before RUIZ, BLACKBURNE–RIGSBY, and THOMPSON, Associate Judges.

BLACKBURNE–RIGSBY, Associate Judge:

This appeal arises from an accident in which appellant Charles Presley ("Presley"), a construction worker renovating the main United States Department of State ("State Department") building, was injured after falling from a twenty-foot high cooling tower assembly. Appellants Charles and Victoria Presley brought suit against both the operator of the crane, CMR,[1] and a consultant to the construction project charged with monitoring the project, CRSS,[2] who appellants allege should have ensured that proper safety procedures were being followed at all times at the workplace. At trial, appellants attempted to prove that Presley was injured because he was knocked off the tower by CMR's crane and that proper safety protections that would have prevented his fall were not in use at the workplace. At the close of evidence, the trial court granted judgment as a matter of law in favor of CRSS on the basis that CRSS owed no legal duty of care to Presley. In addition, the jury returned a verdict in favor of CMR.

Appellants raise several issues on appeal. Appellants' principal contention is that the trial court erred in granting judgment as a matter of law to appellee CRSS on the basis that, as a consultant to the State Department, it owed no legal duty to the construction workers, such as Presley, employed by the general contractor, Grimberg Engineering Company ("Grimberg"), to ensure that safety precautions were followed at the construction site. Specifically, appellants argue that CRSS, which was not a party to the construction contract, nonetheless owed Presley either a statutory duty arising under the District of Columbia Industrial Safety Act ("ISA"),[3] or a common-law tort duty to protect workers on the construction project from safety hazards. Appellants' remaining claims relate solely to the trial against CMR.[4] They contend that the trial court abused its discretion by: 1) excluding an accident report as inadmissible hearsay; 2) admitting for impeachment purposes a witness' prior statement during an interview conducted by a workers' compensation insurance investigator; 3) failing to provide an immediate limiting instruction on the use of impeachment evidence; and 4) excluding the other portions of the witness' inter-

---

1. Commercial Moving & Rigging, Inc. and CMR Leasing, Inc. (together, "CMR").

2. Jacobs Engineering Group, Inc., Jacobs Facilities, Inc. f/k/a Sverdrup Facilities, Inc., and CRSS Constructors, Inc. (together, "CRSS").

3. D.C.Code §§ 32–801 to –812 (2001) *formerly* D.C.Code §§ 36–221 to –232 (1981).

4. Although the jury returned a verdict in its favor, CMR filed a protective cross-appeal. Because of the disposition we reach here, however, we need not address its cross-appeal. *See 3511 13th St. Tenants' Ass'n v. 3511 13th St., N.W. Residences, LLC*, 922 A.2d 439, 441 n. 1 (D.C.2007) (declining to reach cross-appeal where defendants filed it only as a protective measure in the event that an error was found in the jury's verdict).

view in violation of the rule of completeness. Appellants further claim that the trial court erred by denying their motion for judgment notwithstanding the verdict in CMR's favor and refusing to give a jury instruction on their theory of liability. We conclude that, under the circumstances of this case, CRSS owed no legal duty to Presley, and the remaining issues relating to CMR do not warrant reversal. Accordingly, we affirm the trial court's judgment.

## I. Background

### A. *Facts*

In 1991, the State Department contracted with Grimberg to perform renovation and construction on the main State Department building. Presley, a pipefitter with thirty-eight years of experience, was employed by Grimberg as a foreman to facilitate the assembly of eight giant cooling towers for installation on the roof of the building. Grimberg was responsible for directing the assembly of the tower components on a nearby athletic field before they were airlifted to the building's roof. Grimberg contracted with CMR to truck the tower parts to the athletic field, and to provide a crane at that location to hoist and assemble the tower parts.

The State Department, via the General Services Administration ("GSA"), entered into a separate Construction Quality Manager contract ("CQM contract") with CRSS to serve as a contract compliance consultant. Generally, CRSS' main responsibility was to assist the GSA with ensuring that the project was completed according to specifications, on time, and within budget. The CQM contract provided:

> [CRSS] is the Contractor selected to assist the [GSA] by performing required work in the Predesign, Design, Procurement, and Construction Phases, and Claims and Miscellaneous Services as

specified in the contract. In providing the project services described in this contract, [CRSS] shall maintain a *working* relationship with the architect-engineer and construction contractors.

More specifically, the CQM contract required CRSS "to anticipate problems and immediately act to preclude or mitigate any negative effects on the construction project(s)." The CQM contract also provided that CRSS would employ inspectors who were "responsible for scheduling, coordinating, and performing the actual specialized field inspection work commensurate with their designated adjectival discipline." These inspectors were also required to:

> [P]hysically inspect work at the site(s); review all construction work for code compliance and adherence to construction contract requirements; recommend approvals or rejections of materials and workmanship as appropriate; monitor labor and safety requirements; prepare and complete written inspection reports for every inspection; process field reports, including progress reports, testing reports, labor interviews, etc., through the [Quality Control Superintendent] to the Government.

The CQM contract further provided that:

> [CRSS] is not responsible for and will not have control or charge of construction means, methods, techniques, sequences or procedures; safety programs or procedures; or for acts or omissions of other contractors, agents or employees, or any other persons performing any of the work.

The CQM contract contained a general disclaimer:

> Nothing in this contract shall be construed to mean that [CRSS] assumes any of the contractual responsibilities or duties of the architect-engineer or construction contractors. The construction

contractor is solely responsible for construction means, methods, sequences and procedures used in the construction of the project, and for related performance in accordance with its contract with the Government.

The record contains several safety reports authored by CRSS employees pertaining to the project. These safety reports detail safety violations observed by CRSS inspectors, as well as any subsequent action taken by the inspectors. As the CQM contract directs and the safety reports indicate, CRSS inspectors authored the reports and sent them to CRSS superiors. The reports were then forwarded to the GSA for review, and GSA would in turn forward the reports to Grimberg.[5] Each report included the following language:

> The contract between [CRSS] and GSA outlines a few safety responsibilities that includes [sic], reporting on safety infractions that the contractor incurs and other safety deficiencies observed. [CRSS] also has the authority to 'stop work' for imminent danger situations observed. [CRSS] *is not responsible for performing periodic and exhaustive surveys of the work environment in regard to safety.*

(emphasis added). The reports indicate that, in several instances, CRSS inspectors observed employees violating safety procedures. The reports also indicate that work was stopped until the proper safety equipment was put into use and that supervisors were "cautioned on the process" or "notified for correction." The reports, do not,

however, indicate who directed that work be stopped.

On January 7, 2000, Presley was one of several workers who were assembling the components for each of the eight cooling towers—a base cube, a top cube, and a fan shroud [6]—on the athletic field near the main State Department building. CMR was to hoist the top cubes onto the base cubes using a crane. The stacked base and top cubes had a height of approximately twenty feet. After assembling the base and top cubes, CMR was to hoist fan shrouds to the top of each tower. Presley and other Grimberg employees would then use a single ladder to climb to the top of each tower in order to set the fan shroud over the opening and bolt it into place.

At the time of the accident, Presley and his crew were placing the fan shroud on the seventh cooling tower. Presley placed the ladder on the south side of the cooling tower and climbed to the top. After observing that the crane operator had already lowered the fan shroud in place above the cooling tower, Presley directed the operator to swing the fan shroud away to the east. Presley planned to walk to the north side of the tower while crew members climbed the ladder on the south side of the tower. From those positions, they would work together to direct the placement of the fan shroud and bolt it down. The top of the cooling tower was rectangular with a circular opening in the center. To move from the south side to the north side of the tower, Presley had to walk across the expanse of the tower along a four-inch-wide ledge between the circular opening and the edge of the cooling tower.

---

5. For example, as stated in a memorandum from Grimberg to CMR, "[t]he government forwarded a safety memo to [Grimberg] in which they state that CMR employees did not have the proper safety equipment for the work that they were performing...."

6. The fan shrouds are sheet metal cylinders, nineteen feet and four inches in diameter, with a grate on top to cover the fan blade opening.

Presley testified that he had performed this type of maneuver "probably a dozen [times] over [his] career or maybe even more than that." After the crane operator moved the fan shroud, Presley turned his back to the crane and started across the narrow ledge towards the north side of the cooling tower. Presley claims that, as he was moving to the north side of the cooling tower, he glanced up and saw the shroud coming towards him. He testified that he tucked his head down and grabbed on to the tower as tightly as he could, but that the fan shroud hit him on his hard hat, causing him to slip off the edge of the tower and fall to the ground twenty feet below. Donald Hanscher, a witness to the accident, testified that he "heard a little scuffling noise like shoes on a wood floor [and that Presley] . . . . was trying to hang onto the side of the cooling tower and he just fell." CMR employee Darrell Jean Thomas testified that he heard Presley tell others "that he had slipped from the top of the tower and tried grabbing ahold, and couldn't hang on." CMR crane operator Howard Cornwall denied that the fan shroud ever hit Presley, stating that he never moved the fan shroud back after initially moving it away from the tower. Cornwall recounted his version of the incident at trial:

> I knew then what he was going to do and I said to myself and God knows I'm telling you people the truth. I said to myself, don't do that and I had no more said it, then he comes off the edge. . . . And he dropped. He didn't fall, he dropped straight down, he couldn't hold on.

However, Daniel Presley, Charles Presley's brother, was also on site during the accident and testified that Charles was knocked off the tower by the fan shroud. Presley fractured his right ankle and left heel.

Appellants filed suit in Superior Court on October 24, 2002, against CRSS and CMR for negligence and loss of consortium, and later filed an amended complaint on January 6, 2003. CRSS then filed a third-party complaint against the GSA for indemnification, and the GSA removed the case to the United States District Court for the District of Columbia. The District Court dismissed the case against the GSA and remanded the case to the Superior Court. At the close of evidence, the trial court found that CRSS did not owe a duty to Charles Presley and entered judgment as a matter of law in favor of CRSS. The jury considered appellants' remaining claims of negligence and loss of consortium against CMR, and returned a verdict in favor of CMR. The trial court then denied appellants' motion for judgment notwithstanding the verdict. This appeal followed.

### B. Summary of Presley's Evidence and Arguments at Trial

At trial, Presley attempted to recover damages from CRSS under a negligence theory, alleging that CRSS owed him a duty of care, CRSS breached that duty of care, and CRSS' breach of that duty was the proximate cause of his injuries. See Haynesworth v. D.H. Stevens Co., 645 A.2d 1095, 1097–98 (D.C.1994) (citing Powell v. District of Columbia, 634 A.2d 403, 406 (D.C.1993); Levy v. Schnabel Found. Co., 584 A.2d 1251, 1255 (D.C.1991)). In support of his argument that CRSS owed him a duty of care, Presley attempted to establish that CRSS exercised control over the work of the general contractor, Grimberg, regarding safety matters by focusing on CRSS' responsibility to "monitor labor and safety requirements," as outlined in the CQM contract, and CRSS' "authority to 'stop work' for imminent danger situations observed," as noted in the safety reports. Gary Menefee, a Grimberg fore-

man, testified that CRSS "regularly monitored" the work of his crew. He also testified that CRSS stopped the work of his crew to correct safety hazards, such as when his crew had to move pipes out of the way. Joseph Angsten, Grimberg's project manager, testified that CRSS inspectors' responsibilities with respect to monitoring compliance with safety regulations included walking the site on a daily basis and bringing any problems to the attention of Grimberg, either by addressing the Grimberg worker directly or raising the issue to him for correction. He could not recall if any Grimberg employees ever failed to follow a safety code suggestion made by CRSS inspectors, nor could he recall if CRSS inspectors ever stopped work at the site if they encountered safety hazards. Allen Lee Rector, Grimberg's project superintendent, testified that CRSS monitored the work of Grimberg throughout the project. Rector further testified that part of CRSS' function was to monitor compliance with Occupational Safety and Health Administration ("OSHA") requirements. He also testified that if CRSS employees encountered any kind of safety hazard in their monitoring function, they would "certainly bring it to [Grimberg's] attention and [Grimberg] would deal with it." Brian Koches, CRSS' Project Executive, testified that "[i]f a CRSS person saw somebody up on that cooling tower that was in imminent danger of falling ... they should intervene because our company policy is to do just that." However, when asked whether CRSS failed in its mission to monitor the provision of the fall protection in Presley's case, Koches stated that "we were not there monitoring the safety of every operation that th[e] contractor was doing ... because we're not everywhere where that contractor is." Joe Wear, CRSS' Project Manager, admitted that part of CRSS responsibilities under the contract was to "monitor compliance

with safety codes and regulations," and that fall protection was required when someone is working six feet above the ground. However, Wear testified that "monitoring" did not mean "constant supervision," but rather entailed "observation." Wear testified that with respect to safety on the job site, if he and the other inspectors "saw an infraction or saw something that was wrong," they would report it to Grimberg so Grimberg could "take care of the problem." Wear further testified that if he and the other inspectors "saw somebody in danger like needing fall protection," they would "ask him to get down," and call Grimberg's general superintendent to "tell [Grimberg] that they need to do something to protect their employees."

Presley also attempted to establish that CRSS had a duty, which it breached, as a "controlling employer." This duty, he argued, was related to CRSS contractual obligation "to anticipate problems and immediately act to preclude or mitigate any negative effects on the construction project(s)." In addition, Presley relied on the expert testimony of Terry Lane, a former OSHA Area Director. Lane testified that CRSS had "the standard of care" to "anticipate, plan for and monitor expected [safety] hazards," including those falling under the cooling tower placement project. In reaching this conclusion, Lane relied on the American National Standards Institute ("ANSI") standard governing safety programs for multi-employer worksites. Lane explained that the industry use of the ANSI standards did not rely solely upon contracts as the basis of duties because the safety business recognizes the obligation of "controlling employers." He then stated that "[c]ontrolling employers are those people such as CRSS who are the boss of the site." However, CRSS' counsel objected because Lane's testimony

went beyond "mere expert testimony" and into "the province of the [c]ourt in terms of determining what the applicable law will be to determine whether or not an obligation is owed." The court agreed, finding that "controlling employer" did not come from the ANSI standard, but from OSHA's Multi–Employer Citation Policy, which was outside the scope of Lane's testimony. The court then permitted Presley to question Lane about what the ANSI standard stated with respect to the responsibilities of a "project constructor." [7] Lane testified that CRSS met the definition of a project constructor because it was "responsible for supervising and controlling the construction work performed on this project." However, he noted that "contractors are responsible for developing, implementing, monitoring and enforcing their safety and health program unless the requirements are performed by a higher contractor." Lane further testified that CRSS had another duty, which was applicable to all of the contractors on the site, based on the ANSI standard. This duty was to conduct and implement a hazard analysis describing potential hazards and actions required to provide a safe and healthful workplace, which was to be undertaken at the initiation of a construction project and for the critical stages of work.

Lane testified that based on this last duty arising from the ANSI standard, CRSS failed to "anticipate, plan for and monitor expected [safety] hazards." In particular, Lane testified that it was "obvious that work was going to be done well above six feet and CRSS did not anticipate it," and "CRSS did not plan for it and [CRSS] certainly did not monitor it."

Lane further stated that had CRSS met its standard of care, he believed that Presley would not have been injured "because a properly planned construction of these towers would not have resulted in the fall."

Presley attempted to establish that CRSS had a duty of due care stemming from its contractual obligation "to anticipate problems and immediately act to preclude or mitigate any negative effects on the construction project(s)." CRSS' Project Manager Wear admitted that in order to anticipate, CRSS "had to be able to foresee there might be a problem if the code requirements were not complied with." Wear stated that, at the meetings regarding the assembly of the cooling towers, "there w[as] no [discussion of] safety requirements for people like Mr. Presley going up on top of the towers." He noted that neither Presley nor Grimberg consulted with him in advance about how to do the work at the site. Wear further stated that on the day of the incident, no CRSS employees were on site, and thus did not see anyone at the site working in a situation that required fall protection.

## II. Analysis

### A. *Whether CRSS Owed a Duty of Care to Presley*

 Appellants contend that the trial court erroneously granted judgment as to CRSS on the basis that CRSS owed no legal duty of care to Presley. We review the grant of a motion for judgment as a matter of law *de novo. Carleton v. Winter,* 901 A.2d 174, 178 (D.C.2006); *Brown v. Nat'l Acad. of Scis.,* 844 A.2d 1113, 1117 (D.C.2004). "Judgment as a matter of law

---

7. It is not entirely clear from Lane's testimony which ANSI standard served as the basis for his testimony. Lane stated that he relied on the definition of "project constructor" as outlined in § 3.2, which governs responsibilities and authorities, of the relevant ANSI standard. A review of the record demonstrates that he testified regarding the ANSI "Standard on Construction and Demolition Operations—Safety and Health Program Requirements for Multi–Employer Projects."

may be granted only if, when the evidence is viewed in the light most favorable to the opposing party, there is 'no legally sufficient evidentiary basis for a reasonable jury to find' for the non-moving party." *Brown, supra,* 844 A.2d at 1118 (quoting Super. Ct. Civ. R. 50(a)). "This is an exacting standard, and 'it is only in the unusual case, in which only one conclusion could reasonably be drawn from the evidence, that the court may properly grant judgment [as a matter of law].' " *Id.* (alteration in original) (quoting *Homan v. Goyal,* 711 A.2d 812, 817 (D.C.1998)). Whether there is a duty of care is a question of law. *Tolu v. Ayodeji,* 945 A.2d 596, 601 (D.C.2008).

Appellants contend that CRSS owed a duty to Charles Presley to ensure that proper safety procedures were in place at the worksite to protect him and other workers, and that CRSS' breach of that duty caused Presley's fall and resulting injuries. In support of this contention, appellants raise two arguments: first, that a statutory duty existed under the obligations imposed by the ISA, and second, that CRSS assumed a common-law duty of care to Presley by undertaking to monitor safety conditions in the CQM contract. We conclude that appellants' claims fail because they have not established that CRSS owed Presley a legal duty under either theory.[8]

### 1. *Duty Arising Under the Industrial Safety Act*

■ Appellants look to the ISA to support their argument that CRSS had a statutory duty of care to Presley. The ISA requires that "[e]very employer shall furnish a place of employment which shall be reasonably safe for employees, [and] shall

furnish and use safety devices and safeguards...." D.C.Code § 32–808(a). The ISA defines an "employer" as someone "having control or custody of any place of employment or of any employee." D.C.Code § 32–802(1). An examination of our existing case law interpreting the meaning of "custody or control," which we undertake below, demonstrates why appellants' reliance on the ISA to argue that CRSS was an "employer," and thus had a duty to Presley, is misplaced. Appellants nonetheless assert that CRSS exercised the necessary "control or custody" over the workplace or of "any employee" to be considered an "employer" under the ISA because: 1) there is "compelling evidence" demonstrating that CRSS exercised the requisite "control or custody"; 2) their expert witness testified that CRSS had "the standard of care" to "anticipate, plan for and monitor expected [safety] hazards," including those falling under the cooling tower placement project, notwithstanding its contractual obligations; and 3) CRSS assisted the State Department in acquiring the permit for use of the athletic fields where the cooling towers were assembled. However, we conclude that each of these arguments is without merit.

To determine whether CRSS was an "employer" such that the statutory duty to provide a safe workplace under the ISA was triggered, an examination of our existing case law interpreting the meaning of "control or custody" of the worksite is illustrative. In particular, when an employer does not have direct "custody or control" over the employee, as in the present case, we have emphasized ownership of the worksite and authority with respect to safety rules in finding that an entity is an "employer" under the ISA. In *Traudt v.*

---

**8.** Because we conclude that CRSS did not owe Presley a duty as a matter of law, we do not reach the issues of whether CRSS negligently performed its contractual undertaking or whether CRSS' actions (or inactions) were the proximate cause of Presley's injuries.

*Potomac Electric Power Co.*, 692 A.2d 1326 (D.C.1997), we reviewed a grant of summary judgment for the general contractor and reversed. 692 A.2d at 1329. There, an independent contractor's employee was injured while attempting to remove asbestos with a screwdriver from energized electric cables. *Id.* at 1330–31. We found it important that PEPCO "retained ownership of the workplace and the electric cables, asserting this form of control concretely by dictating that work on the cables was to be done while they were energized." *Id.* at 1331. We also emphasized that "PEPCO insisted on compliance with its own as well as public safety rules and reserved the right to inspect that work, direct stoppage, and require replacement or supplementation of personnel and equipment in case of noncompliance with the contract." *Id.* Thus, we held that "PEPCO's ownership of the manhole system and the electric cables, together with the authority it reserved in the contract to monitor [the independent contractor's] work and perform other work simultaneously at the job site, established its control of the 'place of employment' sufficient to make it Traudt's employer for purposes of the statute." *Id.*

█ Similarly, we determined that the defendant was an "employer" under the ISA in *Velásquez v. Essex Condominium Ass'n*, 759 A.2d 676 (D.C.2000), where we reviewed the grant of summary judgment

and affirmed. 759 A.2d at 678. Essex Condominium Association, the owner of Essex Condominiums, and the property manager (together, "Essex") contracted with an independent contractor, Ev–Air–Tight, to renovate the concrete facade of its building. *Id.* Velásquez was employed by Ev–Air–Tight and was injured in a fall from a scaffold being used in the renovation project. *Id.* We emphasized that the contract between Essex and Ev–Air–Tight required Ev–Air–Tight to "obey ... the rules and regulations which may from time to time during [its] work be promulgated by [Essex] for various reasons such as safety, health, preservation of property or maintenance of a good and orderly appearance to the area." *Id.* at 679 (alteration in original) (internal quotation marks omitted). Thus, we held that Essex constituted an "employer" within the meaning of the ISA because Essex owned the property where the work was performed and retained authority to promulgate rules and regulations and monitor the work performed by Ev–Air–Tight. *Id.* at 681.[9]

Our decisions in *Traudt* and *Velásquez* reflect the principle that the ISA—particularly its definition of "employer"—is to be read broadly. *See Martin v. George Hyman Constr. Co.*, 395 A.2d 63, 70 (D.C. 1978). However, even with broad interpretations, *Traudt* and *Velásquez* do not support a determination that CRSS was an "employer" under the ISA. CRSS did not,

9. Despite determining that Essex was an "employer" under the ISA, we nevertheless held that a reasonable jury could not find that Essex breached a statutory duty of care to Velásquez. *Velásquez, supra*, 759 A.2d at 681. We recognized that once a statutory duty was established, it was "still necessary to determine the scope of the duty of due care under the statute and the reasonableness of defendant's actions." *Id.* Thus, "an employer's responsibility under the [ISA] for a particular injury is commensurate with the nature and extent of the control it exercises in fact over

the workplace." *Id.* Although Essex retained authority "to perform construction or operations related to the [p]roject," we found it important for purposes of analyzing whether Essex breached its duty that Essex never "actually instructed, directed or otherwise controlled Ev–Air–Tight employees in relation to the renovation project" and that "Ev–Air–Tight owned and erected the scaffolding, and no one from Essex ... had access to the scaffolding from which Velásquez fell." *Id.* at 679, 681 (internal quotation mark omitted).

under the contract here, have the degree of control over the workplace to qualify as an "employer" that was present in both *Traudt* and *Velásquez*. In contrast to the employers in *Traudt* and *Velásquez*, CRSS did not own the property on which the injured individual was working.

More importantly, CRSS did not maintain the same degree of authority with respect to safety rules as the employers did in *Traudt* and *Velásquez*. Although appellants place much emphasis on the CQM contract language requiring CRSS to "monitor" and "report" on various safety violations, CRSS did not have the authority to rectify safety violations directly under the CQM contract. Rather, the CQM contract required CRSS to "inspect," "review," "monitor," and "report," and then submit the reports to the GSA, which in turn submitted them to Grimberg to take the appropriate actions.[10] Although the CRSS safety reports indicate that CRSS had limited authority to stop work in situations where it actually observed "imminent danger situations"—and it appears that on occasion CRSS stopped the work of Grimberg employees to correct safety hazards it observed first-hand—the reports also state that CRSS was "not responsible for performing periodic and exhaustive sur-

veys of the work environment in regard to safety." Furthermore, even in viewing the testimony of Joseph Angsten, Grimberg's project manager, in the light most favorable to appellants, we cannot say that his testimony establishes that CRSS had the level of authority with respect to safety rules such that it can be deemed an "employer" under the ISA. Although Angsten testified that CRSS inspectors' responsibilities with respect to monitoring compliance with safety regulations included walking the site on a daily basis and bringing any problems to the attention of Grimberg, he could not recall if CRSS inspectors ever stopped work at the site if they encountered safety hazards.[11] Thus, CRSS' limited authority falls well short of the level of contractual authority retained by the employers in *Traudt* and *Velásquez*, where the employers were responsible for promulgating and implementing specific safety regulations.

Nonetheless, appellants argue that "the most compelling evidence one can imagine to demonstrate control over the safety aspects of the employment and the place of employment" is the "draft notices" that Grimberg proposed to send to its subcontractors, which Grimberg sent to CRSS in advance for approval. However, the draft

---

10. In addition, the employers in *Traudt* and *Velásquez* were part of a vertical relationship in which duties and rights were delegated and reserved amongst the employer, contractor, and sub-contractor. By contrast, CRSS was a consultant to the State Department—separate and apart from the chain of delegation running from the GSA to Grimberg and eventually to Presley.

11. Although Angsten testified that CRSS was responsible for walking the site on a daily basis, and, inferentially, that CRSS was in breach if it did not have any personnel on site when the cooling tower assembly took place, there was no support for that interpretation in the contract and it was contradicted by the language in CRSS' reports. Angsten was not

qualified to testify as an expert. As a fact witness, and a Grimberg employee, he was not in a position to testify about the contractual expectations of the GSA, the other party to the CQM contract. Viewed in context, Angsten's testimony is best understood not as an authoritative interpretation of CRSS' responsibilities, but as an attempt to deflect CRSS' defense that it was Grimberg, not CRSS, that failed in its duty to provide Presley with fall protection gear. Furthermore, there was no evidence presented that GSA had a view different from CRSS' view about CRSS' duties under the contract. Therefore, we do not think that Angsten's unsupported personal opinion sufficed to create a disputed fact of the extent of CRSS' responsibilities.

notices do not state that Grimberg requested CRSS' approval; rather, they noted the actions that Grimberg took in response to the safety violations that CRSS noted in its safety reports. Furthermore, Grimberg noted that "[i]f for any reason a sub-contractor cannot operate in a safe manner, [Grimberg] will take corrective measures." Also, appellants' reliance on a CRSS safety report that they claim demonstrates that "not only did CRSS exercise the authority to stop the work, they exercised the ultimate control over the workplace, the power to discharge an employee for failing to comply with safety code requirements," is misplaced. The safety report stated that CRSS "[o]bserved a selected employee working from an elevated area without fall protection; a fall hazard of approximately 12 feet," after which the "[e]mployee was cautioned of the hazard and supervisor [was] notified." The report further stated that if the worker was seen without the use of fall protection again, he would be "removed." However, the report did not state and there was no testimony about who cautioned the employee and who would have removed the employee if he was seen without the use of fall protection again. Thus, even viewing the evidence in the light most favorable to appellants, we cannot say that there is evidence in the record to support that CRSS was an "employer" as defined under the ISA.

■ In support of their contention that CRSS nevertheless exercised "custody and control" over the workplace in a manner sufficient to bring CRSS within the ambit of the ISA, appellants point to the expert testimony of Terry Lane, a former OSHA Area Director. Lane testified that CRSS had "the standard of care" to "anticipate, plan for and monitor expected [safety] hazards," including those falling under the cooling tower placement project, notwithstanding its limited contractual obligations.

Relying on the applicable ANSI standard, Lane testified that CRSS had to conduct and implement a hazard analysis describing potential hazards and actions required to provide a safe and healthful workplace, which was to be undertaken at the initiation of a construction project and for the critical stages of work. Lane further testified that based on this duty, CRSS failed to "anticipate, plan for, and monitor expected [safety] hazards." However, this duty falls well short of the expansive type of obligations with respect to safety that we held amounted to the requisite "custody or control" to be deemed an "employer" in *Traudt* and *Velásquez*, as there is no evidence that CRSS promulgated safety regulations or breached an obligation to maintain a constant presence at the workplace to oversee safety requirements. Angsten's testimony that CRSS inspectors' responsibilities with respect to monitoring compliance with safety regulations included walking the site on a daily basis and bringing any problems to the attention of Grimberg does not amount to an obligation to *promulgate* safety regulations or maintain a *constant* presence at the workplace to oversee safety requirements. It is undisputed that no CRSS investigators were on site on the day that Presley was injured. The evidence (or permissible inferences from evidence) that CRSS had some authority to stop work and perhaps, at times, might have "intervened" with Grimberg to remind them of safety requirements, shows, at most, limited and infrequent interactions that are insufficient to establish that CRSS had the requisite control, in fact, over the workplace when Presley was injured. Particularly where an entity does not own the workplace, liability under the ISA must be grounded on facts showing authority and actual control. *See Velásquez, supra,* 759 A.2d at 681 (noting that "an employer's responsibility under the [ISA] for a particular inju-

ry is commensurate with the nature and extent of the control that it exercises in fact over the workplace"). Thus, even viewing Lane's testimony in the light most favorable to appellants, we cannot say that there is evidence in the record to support that CRSS was an "employer" as defined under the ISA.[12]

Appellants also contend that CRSS' role in assisting the State Department in the acquisition of the permit to use the athletic fields was evidence that CRSS exercised control and custody of the workplace, thus demonstrating that it was an employer pursuant to § 32–802(1) of the ISA. However, the acquisition of the permit to use the athletic fields does little to bolster appellants' claim that CRSS was an employer under the ISA. Although CRSS assisted in the acquisition of the permit to

use the athletic fields, the permit was issued to the State Department and does not mention CRSS. We cannot say that such limited involvement indicates that CRSS had control or custody over the workplace.

In conclusion, CRSS lacked the requisite "control or custody" over the workplace to be considered an "employer" under the ISA. See D.C.Code § 32–802(1). CRSS' principal role was as a consultant to the State Department. CRSS did not own the worksite, did not promulgate safety regulations, had only limited authority to stop work, did not normally act directly to rectify safety violations, and was not required to maintain a constant presence at the workplace. Therefore, CRSS had no duty to Presley under the ISA to ensure that safety procedures were followed.[13]

12. In a Rule 28(k) letter submitted after oral argument, appellants urge us to consider *Strub v. C & M Builders, LLC*, 193 Md.App. 1, 996 A.2d 399 (2010), *rev'd*, 420 Md. 268, 22 A.3d 867 (2011), in which the Court of Special Appeals of Maryland discusses the Maryland Occupational Safety and Health Act ("MOSHA"), the Maryland counterpart to the federal Occupational Safety and Health Act ("Act"). We note that *Strub* addresses the Maryland statute, which is different from the ISA. However, the reasoning of the Court of Appeals of Maryland in reversing *Strub* is nonetheless helpful to our analysis in the present case. The Court of Appeals stated that because it was "undisputed that [the employee] was not an employee of [the subcontractor]," the general duty provisions of MOSHA and the Act were inapplicable. 22 A.3d at 872. Thus, the Court of Appeals stated that "the Court of Special Appeals was incorrect in concluding that [the subcontractor] owed [the employee] a 'duty to maintain a safe workplace' because that is a general duty that, by statute, runs only to an employer's own employees." *Id.* Instead, the Court of Appeals addressed the question of whether the subcontractor owed the employee a duty under the specific duty provisions of MOSHA and the Act. *Id.* The Court of Appeals recognized that federal courts have held that the specific duty provision of the Act creates a duty that "extends to a more general class

than the general duty to provide a safe environment" because the duty to abide by standards on a multi-employer worksite runs to all employees. *Id.* (quoting *Solis v. Summit Contractors, Inc.*, 558 F.3d 815, 818 (8th Cir. 2009)) (internal quotation marks omitted). However, the Court of Appeals declined to adopt the "multi-employer worksite doctrine" or its "creating employer" citation policy under the Act, in which " 'creating employers' are held to owe a duty to non-employees where there is evidence of continued presence, responsibility, maintenance, etc. at the worksite." *Id.* at 877. The Court of Appeals reasoned that "[e]ven if [the subcontractor] 'created' a hazard that was in violation of a regulation, it did not exercise continuing control, or even a presence, at the worksite at the time of [the employee's] fatal accident." *Id.* at 879. Because the subcontractor did not owe a duty of care to the employee under MOSHA, the Court of Appeals also held that "regulations promulgated under MOSHA were inadmissible as evidence of the standard of care." *Id.* at 869. Here, Presley was not a direct employee of CRSS. More importantly, CRSS did not exercise continuing control, nor was CRSS present, at the worksite at the time of Presley's accident.

13. Appellants also contend that the trial court determined there was no duty solely on the

### 2. Duty Arising Under a Common–Law Tort Theory

Appellants next contend that CRSS, by virtue of the services it undertook and performed under the CQM contract, assumed a duty of care to Presley under a common-law tort theory.[14] *See Haynesworth, supra*, 645 A.2d at 1097–98. The thrust of appellants' argument is that CRSS assumed a duty of exercising reasonable care in carrying out its contractual obligations that extended to workers on the site, irrespective of whether contractual privity with those workers existed. Specifically, appellants argue that CRSS "assumed the duties owed by [the] GSA to [ ] Presley as controlling employer" once CRSS undertook the responsibility pursuant to the CQM contract to "monitor labor and safety requirements." However, an examination of our case law demonstrates why appellants' arguments are unpersuasive.

"[A] defendant is liable to a plaintiff for negligence only when the defendant owes the plaintiff some duty of care." *Youssef v. 3636 Corp.*, 777 A.2d 787, 792 (D.C.2001) (citing *Kerrigan v. Britches of Georgetowne, Inc.*, 705 A.2d 624, 628 (D.C.1997)). "[A] determination of whether a duty exists is the result of a variety of considerations and not solely the relationship between the parties." *Bd. of Trs. of Univ. of District of Columbia v. DiSalvo*, 974 A.2d 868, 871 (D.C.2009). In the absence of contractual privity with an unrelated third party, whether a party should have foreseen that its contractual undertaking was necessary for the protection of the third party is important. *See Haynesworth, supra*, 645 A.2d at 1098–99. Thus, even in the absence of contractual privity, we still look to the contract to determine the scope of the undertaking as it relates to the protection of the third party. *See id.* at 1098; *Caldwell v. Bechtel, Inc.*, 203 U.S.App.D.C. 407, 418–19, 631 F.2d 989, 1000–01 (1980). In addition, "[t]he existence of a duty is also shaped by considerations of fairness and 'results ultimately from policy decisions made by the courts and the legislatures.'" *DiSalvo, supra*, 974 A.2d at 871 n. 2 (quoting *Williams v. Baker*, 572 A.2d 1062, 1064 (D.C.1990) (en banc)).

In our jurisdiction, we have acknowledged that a legal duty arises when a party undertakes to "render[ ] services to another which he should recognize as necessary for the protection of a third person

---

basis of the contract and did not consider the possibility of a duty arising under the ISA. A review of the record, however, indicates that the trial court did indeed consider the ISA and specifically distinguished *Traudt* and *Velásquez* from the present case when it determined that CRSS owed no duty to Presley.

**14.** Presley was not a party to the CQM contract between CRSS and the GSA. Thus, there is no contractual privity between Presley and CRSS, nor does the CQM contract support a third-party beneficiary argument. "Third-party beneficiary status requires that the contracting parties had an express or implied intention to benefit directly the party claiming such status." *Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1064 (D.C.2008) (quoting *Alpine Cnty., Cali-*

*fornia v. United States*, 417 F.3d 1366, 1368 (Fed.Cir.2005)) (internal quotation marks omitted). " '[A]n indirect interest in the performance of the undertakings' is insufficient." *Id.* (alteration in original) (quoting *German Alliance Ins. Co. v. Home Water Supply Co.*, 226 U.S. 220, 230, 33 S.Ct. 32, 57 L.Ed. 195 (1912)). There is no reference in the CQM contract to Grimberg, Presley's employer, or any of Grimberg's subcontractors as a third-party beneficiary of the contract between CRSS and the GSA. *Cf. Osborne v. Howard Univ. Physicians, Inc.*, 904 A.2d 335, 342–43 (D.C.2006) (release provision specifically named plaintiff as the third-party beneficiary); *Woodfield v. Providence Hosp.*, 779 A.2d 933, 937 (D.C.2001) (release provision specifically identified the third-party beneficiaries).

or his things...." *Haynesworth, supra,* 645 A.2d at 1097 (quoting RESTATEMENT (SECOND) OF TORTS § 324A (1965)) (internal quotation marks omitted). In *Haynesworth,* we looked to § 324A, Liability to Third Person for Negligent Performance of Undertaking, of the RESTATEMENT (SECOND) OF TORTS, in determining whether a party who performs services under a contract for one party assumes a duty to an unrelated third party. *Id.* Section 324A recognizes that:

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if

(a) his failure to exercise reasonable care increases the risk of such harm, or

(b) he has undertaken to perform a duty owed by the other to the third person, or

(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

§ 324A, RESTATEMENT (SECOND) OF TORTS. In *Haynesworth,* we determined that a plumber who contracted with the owner to repair a broken pipe in a common area of a building did not assume a duty to warn the management company or the public of the dangerous condition—ice in a nearby alley—caused by the broken pipe. 645 A.2d at 1099. We reasoned that neither the contract nor the practice in the plumbing industry extended the plumber's legal obligation beyond repairing the faulty plumbing. *Id.* at 1098–99. Thus, the plumber could not have foreseen that his undertaking, the fixing of a broken pipe, was necessary for the protection of a passerby such

that a legal duty of care would arise to warn third parties. *Id.* at 1099.

In the present case, finding a common-law duty depends primarily on whether CRSS should have recognized that its undertakings pursuant to the CQM contract were necessary for the protection of Presley. *See id.* at 1098–99. Though appellants' claim is premised upon a tort theory, the CQM contract nevertheless remains central to our analysis of duty, as it defines the scope of the undertaking and the services rendered by CRSS. *See id.* at 1098; *Caldwell, supra,* 203 U.S.App.D.C. at 418–19, 631 F.2d at 1000–01. By examining the scope of CRSS' undertaking and services pursuant to the CQM contract, we can then determine whether CRSS assumed a duty to exercise reasonable care in carrying out its contractual obligations that extended to workers such as Presley on the site.

We are not persuaded that any evidence shows CRSS should have foreseen that its obligation under the CQM contract to "anticipate problems" and to "monitor" safety compliance was "*necessary* for the protection" of Presley. *See Haynesworth, supra,* 645 A.2d at 1097 (emphasis added) (quoting RESTATEMENT (SECOND) OF TORTS § 324A) (internal quotation marks omitted). The renovation of the main State Department building was a significant undertaking with a broad scope, spanning several years and involving numerous contracting parties to ensure that the contracts were being performed on time and according to specifications. The GSA, through Grimberg, a skilled construction contractor, implemented safety standards and procedures that were to be followed by the construction workers and contractors on the site at all times. In contrast, CRSS undertook to perform only the limited duties of a contract compliance consultant, not the more extensive duties of a

safety engineer or general construction manager, and was not required to have safety personnel on site at all times. *Cf. Caldwell, supra,* 203 U.S.App.D.C. at 412–13, 631 F.2d at 994–95 (finding a duty because the safety engineer was required to develop and ensure compliance with safety procedures, to maintain a constant presence on the job site, and to direct the contractor to correct any unsatisfactory condition); *Brady v. Ralph M. Parsons Co.,* 82 Md.App. 519, 572 A.2d 1115, 1118–19 (1990) (finding a duty because the contract required the construction manager to "provide safety engineering services . . . necessary to develop and ensure the application of a uniform system of safety and accident prevention and reporting procedures[,] . . . to provide safety engineering services as required to ensure compliance with . . . applicable guidance[,] . . . [and to] also direct contractors to correct any unsafe acts or conditions that may be detected."). The limited scope of CRSS' undertaking included non-exhaustive and occasional inspections, which ultimately benefitted Presley and the other Grimberg workers. However, these inspections were not the primary means of ensuring that safety precautions were taken at all times. Under the contractual scheme, that was the primary obligation of Grimberg and the other contractors charged with performing the actual construction work. *Cf. Brady, supra,* 572 A.2d at 1121. Thus, it was not reasonably foreseeable to CRSS that its responsibility under the CQM contract, limited as it was to occasional inspections and reports, was *necessary* to protect Presley. *See Long v. District of Columbia,* 261 U.S.App.D.C. 1, 3, 10, 820 F.2d 409, 411, 418 (1987) (holding that PEPCO "acquired a duty to foreseeable plaintiffs," traveling members of the general public, by "enter[ing] into a contract to perform services within its field of expertise," which included repair of malfunctioning traffic signal controls and notification of the repair or continuing malfunction of this safety equipment); *Caldwell, supra,* 203 U.S.App.D.C. at 418, 420, 631 F.2d at 1000, 1002 (determining that safety engineer's duty arose from a "contractual relationship from which it was foreseeable that a negligent undertaking . . . might injure the appellant," and noting the "superior skills" of the safety engineer "to take steps reasonable under the circumstances to protect appellant from the foreseeable risk of harm . . . ."); *Brady, supra,* 572 A.2d at 1121 (holding that construction manager's duty arose from the notion that "one who assumes the contractual obligation to supervise and enforce safety on a multi-employer worksite owes a duty of reasonable care to a worker even though he or she has no contractual privity").

Furthermore, policy considerations of fairness counsel against imposing a duty on CRSS where doing so would effectively restructure the contractual relationships and obligations undertaken by the parties. *See DiSalvo, supra,* 974 A.2d at 871 n. 2. The GSA hired CRSS not as a guarantor, but to monitor the projects and report to the GSA. CRSS' CQM contract with GSA made clear that it was not intended to supplant the obligations of Grimberg, as general contractor, and the other contractors that had operational charge of construction. ("[CRSS] is not responsible for and will not have control or charge of construction means, methods, techniques, sequences or procedures; safety programs or procedures; or for acts or omissions of other contractors, agents or employees, or any other persons performing any of the work."). The GSA and CRSS also made clear in the CQM contract that the GSA was not delegating, and CRSS was not assuming, any of the duties of the architect-engineer or construction contractors.

("Nothing in this contract shall be construed to mean that [CRSS] assumes any of the contractual responsibilities or duties of the architect-engineer or construction contractors."). To impute the claimed duty to CRSS, despite the explicit disclaimers and specified contractual responsibilities in the CQM contract, would improperly realign the allocation of risks and responsibilities structured in private contractual agreements. *See Haynesworth, supra,* 645 A.2d at 1099. There is no cause to do so where the evidence does not show that the GSA or Presley relied on CRSS to patrol and control the worksite, which would have been beyond the scope of CRSS' limited undertaking in the CQM contract. We have noted that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Sec. Nat'l Bank v. Lish,* 311 A.2d 833, 834 (D.C.1973) (quoting *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 276 (1922)) (internal quotation marks omitted). Notably, there is no evidence that CRSS acted beyond the limited scope of its undertaking at the time of the incident, as its inspectors were not on site when Presley was attaching the fan shrouds—nor were they required to be—and did not see the dangerous activity.[15] Although Angsten testified that CRSS inspectors' responsibilities with respect to monitoring compliance with safety regulations included walking the site on a daily basis, this was not an explicit obligation of CRSS under the CQM contract.[16] Therefore, CRSS cannot be said to have assumed the GSA's or Grimberg's duty to provide a safe workplace, or their duty to direct and determine the means or methods by which the employees were to perform the work, and we should not extend CRSS' legal obligation accordingly. *See Haynesworth, supra,* 645 A.2d at 1099.

In sum, we are not persuaded that CRSS owed a common-law duty to Presley by virtue of CRSS' obligations under, or as a result of its performance of, the CQM contract. Although imposition of a duty may be appropriate in other cases, with different contractual arrangements, or where the actual performance of the contract indicates a measure of control of the worksite, it is not appropriate to do so based upon the facts in this case. Thus, we discern no error in the trial court's granting of judgment as a matter of law on the basis that CRSS owed no duty to appellants on the facts of this case.

### B. *Alleged Evidentiary Mistakes*

██ The remaining claims made by appellants relate only to appellee CMR. Appellants assert that the trial court made four evidentiary errors that warrant reversal. First, appellants contend that the trial court abused its discretion by excluding an accident report authored by Grimberg's quality control manager, Joseph Angsten. Second, appellants contend that the trial court abused its discretion by allowing portions of an unauthenticated pre-trial interview of Daniel Presley, appellant Charles Presley's brother, as conducted by workers' compensation insurance investigator Sharon Poole, to be used for impeachment. Third, appellants argue that the trial court abused its discretion by

---

**15.** We note that neither Presley nor Grimberg consulted with CRSS in advance about how Presley was going to attach the fan shrouds.

**16.** Appellants concede that CRSS inspectors were not on site at the time of the incident, but contend that CRSS inspectors were required to be on site based on CRSS' duty to "anticipate problems" and to "monitor" safety compliance. As noted above, it was not reasonably foreseeable that the limited scope of CRSS' undertaking based on such language was *necessary* to protect Presley.

failing to provide an immediate limiting instruction to the jury after portions of the interview transcript were read. Fourth, appellants argue that the trial court abused its discretion by failing to allow other sections of the interview to be used to rehabilitate Daniel Presley, in violation of the rule of completeness. In considering these claims, we start from the well-established proposition that "[t]he trial court has broad discretion to determine whether evidence is relevant and should be admitted." *Price v. United States*, 697 A.2d 808, 813 (D.C.1997) (citing *United States v. Mosby*, 495 A.2d 304, 305 (D.C. 1985); *United States v. Riley*, 550 F.2d 233, 236 (5th Cir.1977)). Applying this proposition to the present case, we conclude that appellants' arguments are without merit.

### 1. *Accident Report*

▮▮▮▮ First, appellants assert that the trial court abused its discretion in excluding the First Report of Injury Form prepared by Joseph Angsten as inadmissible hearsay. The trial court excluded the report, over appellants' objection, because Angsten did not witness the accident and could not recall from whom he obtained the information that he included in his second-hand report, thus making the report inadmissible hearsay. Appellants argue that the accident report was not hearsay, as it was admitted only to bolster Presley's credibility. However, we fail to see the distinction. "Hearsay is an out-of-court assertion of fact offered into evidence to prove the truth of the matter asserted." *Jones v. United States*, 17 A.3d 628, 632 (D.C.2011) (citing *Mercer v. United States*, 864 A.2d 110, 117 (D.C.2004)). The report was prepared by Angsten shortly after the accident and indicated that the fan shroud had struck Presley. The report would bolster Presley's credibility only if the information contained

within the report was admitted for the truth of the matter asserted. Thus, we cannot say that the trial court abused its discretion in concluding that the report was inadmissible hearsay.

▮▮▮▮ Nor are we persuaded by appellants' argument that the accident report should have been admitted to rebut the theory that Charles Presley had fabricated the story about his fall in order to recover on his negligence claim. The trial court rejected this argument and excluded the report because Presley did not make the statements in the report. A witness' prior consistent statement "used in rebuttal to overcome a charge of recent fabrication, [is admissible] if the statements were made before the motive to fabricate arose...." *Ventura v. United States*, 927 A.2d 1090, 1103 (D.C.2007) (citing *Daye v. United States*, 733 A.2d 321, 325 (D.C.1999)); *see also* D.C.Code § 14–102(b)(2) (2001). However, appellants cannot avail themselves of this exception because the statement they sought to admit was not made by Presley, but rather, as appellants concede, by one of three other workers. Neither the report, nor any of the alleged statements upon which the report was based, is a prior consistent statement made by Presley. Therefore, none of the statements would be admissible under the fabrication rebuttal exception. *See Ventura, supra*, 927 A.2d at 1103. Thus, we conclude that the trial court did not abuse its discretion in excluding the accident report.

▮▮▮▮ We also reject appellants' contention that the report should have been admitted during the testimony of their safety and accident reconstruction expert. The trial court ruled that the expert could rely on the report as a basis for his opinion, but could not disclose the content of the report to the jury because it contained

inadmissible hearsay. Appellants' contention is based upon a misunderstanding of the law as it pertains to expert testimony and the use of inadmissible hearsay. " '[E]xperts may testify on the basis' of not only personal observation and evidence admitted at trial, but also 'other sources relied upon in their fields or specialties.' " *L.C.D. v. District of Columbia ex rel. T.-A.H.D.*, 488 A.2d 918, 921 n. 8 (D.C.1985) (quoting S.W. GRAAE, DISTRICT OF COLUMBIA STATUTORY AND CASE LAW ANNOTATED TO THE FEDERAL RULES OF EVIDENCE ¶ 7.9 (1976)). In forming an opinion, an expert may rely on facts or data that are not admissible, including hearsay. *See Reed v. United States*, 584 A.2d 585, 591 (D.C.1990); *see also* FED.R.EVID. 703.[17] However, while experts may rely on hearsay to form their opinions, their testimony is not a vehicle by which evidence that is otherwise inadmissible may be introduced. The trial court properly applied this rule because the report upon which the expert relied constituted inadmissible hearsay, and thus we can see no abuse of discretion in the trial court's decision to preclude the admission of the accident report.

### 2. *Daniel Presley's Impeachment*

#### a. *The Context of Daniel Presley's Statements*

Daniel Presley testified at trial that he heard "contact," that he saw his brother's "hard hat go off," and that "out of the corner of [his] eye," he saw his brother get knocked off the tower by the fan shroud. CMR then sought to impeach Daniel Presley's trial testimony with what it contends was his prior inconsistent statement made during a workers' compensation claim interview conducted in March 2002 by Poole. In the interview, Daniel Presley stated that he had his back to the crane operator at the time of the accident. He then "noticed out of the corner of [his] eye [that his] brother had lost his footing due to whatever reason, and he ... fell over the side of the tower and caught himself on the edge of the lip of the top of the cooling tower momentarily, and couldn't hang on and then fell." Daniel Presley also stated, "I mean I could sit here, I could sit right here and tell you that yea, the dude definitely done it, he swung it, but I'd be lying like hell you know what I'm saying?" When asked to confirm that he made the prior statements, Daniel Presley testified at trial:

> [If] [y]ou have a recording that could be played that I could listen to, then I can actually confirm that yep, I hear myself saying that. But for you to present something to me saying that this is what I said, the only thing I can answer is if you're saying that this is authentic, it must be so. But for me to tell you that I recall saying this five years ago, I can't recall.

On redirect examination, appellants sought to rehabilitate Daniel Presley by having him explain the portions of the interview with which CMR sought to impeach him. CMR objected, however, arguing that Daniel Presley did not adopt the statements and thus could not put into context statements that he did not remember making. Appellants then abandoned that line of questioning, and sought to have

---

**17.** "This court follows FED.R.EVID. 703." *Roberts v. United States*, 916 A.2d 922, 939 n. 20 (D.C.2007) (citing *In re Melton*, 597 A.2d 892, 901 (D.C.1991) (en banc)). FED.R.EVID 703 states, *inter alia*, "Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect." Here, nothing in the accident report would have helped the jury evaluate the expert's opinion.

Daniel Presley explain other portions of the interview that CMR had not used for impeachment, including his statement to Poole that his brother, Charles Presley, told him that he had been knocked off the tower by the crane. The trial court rejected appellants' attempt to introduce the other portions of the interview, reasoning that the statements did not actually rehabilitate the witness.

Ultimately, however, the trial court allowed appellants to use the interview to refresh Daniel Presley's recollection about what his brother had said about the accident. Daniel Presley eventually testified that his brother told him "that he would hate to think that the crane operator intentionally knocked him off the tower." During deliberations, the jury requested to see a copy of Poole's report on the interview containing Daniel Presley's statement. In response, the trial court, with the agreement of the parties, fashioned a note which read:

> [P]ortions of the deposition testimony of Sharon Pool [sic] was [sic] read to you in evidence, both parties have the right to select what would be read. Her report is not in evidence, therefore, the Court is unable to provide additional information. Thank you.

### b. *Admissibility of Impeachment Evidence*

■ Appellants argue that the workers' compensation interview should not have been used to impeach Daniel Presley because it was inadmissible hearsay and did not actually contradict his testimony. With respect to the hearsay argument, we have largely adopted the traditional common-law rule that "a prior inconsistent statement can be used to impeach a witness when the witness testifies at trial in a manner contrary to that [prior] statement; however, the substance of the prior state-

ment cannot be used as evidence of its truth." *Johnson v. United States,* 820 A.2d 551, 556 (D.C.2003). Here, the record indicates that CMR did not seek the admission of the statements as substantive "evidence of its truth," but rather to impeach Daniel Presley. Because the trial court declined to admit the statements as substantive evidence, it is immaterial whether the statement was hearsay. Thus, we reject appellants' contention that Daniel Presley's statements during the worker's compensation interview should have been excluded as inadmissible hearsay.

■ Although the statements were not admitted as substantive evidence, we still need to address appellants' arguments that the prior statements could not be used for impeachment purposes because they were not authenticated and did not actually contradict Daniel Presley's testimony at trial. The trial court addressed both of these issues during final instructions to the jury, as both issues were within the jury's purview. *See* Standardized Civil Jury Instructions for the District of Columbia, No. 3–8 (2010 ed. rev.); *see also Georgetown Univ. v. District of Columbia Dep't of Emp't Servs.,* 862 A.2d 387, 392 (D.C.2004). The trial court instructed the jury "to decide whether a witness made a statement on an earlier occasion and whether it was, in fact, inconsistent with the witness' testimony here in court." The trial court further instructed that:

> If the witness was not under oath and subject to cross examination, they were not at a deposition when he or she made this statement, then you may not treat that prior statement as evidence of the facts in the statement. You may only consider that statement to evaluate the witness' credibility.

The trial court's instructions were appropriate and conformed to the Standardized

Civil Jury Instructions for the District of Columbia. *See* Standardized Civil Jury Instructions for the District of Columbia, No. 3–8. Thus, the trial court did not abuse its discretion in allowing the jury to determine whether Daniel Presley made the prior statements, whether the prior statements were inconsistent, and the effect, if any, that Daniel Presley's prior statements had on his credibility at trial.

### c. *Appellants' Request for a Limiting Instruction*

■ Appellants further argue that the trial court erred in refusing their request to give an immediate limiting instruction to the jury regarding the evaluation of impeachment evidence. We have held that "[w]here there has been a request for a limiting instruction following the impeachment of a witness or the presentation of impeaching testimony and the use of the impeaching testimony as substantive evidence is potentially prejudicial, it is error for a trial court to refuse to give such an instruction." *Brooks v. United States,* 448 A.2d 253, 259 (D.C.1982) (citing *Towles v. United States,* 428 A.2d 836 (D.C.1981); *Johnson v. United States,* 387 A.2d 1084 (1978) (en banc)); *see also Gilliam v. United States,* 707 A.2d 784, 785 (D.C.1998). Arguably, the trial court erred in refusing appellants' request for a contemporaneous limiting instruction because Daniel Presley's prior statements during his interview with Poole were introduced for impeachment only, and the use of such statements as substantive evidence was potentially prejudicial to appellants' case because they tended to support CMR's version of events. However, assuming without finding error, we nevertheless conclude that the trial court's refusal to give the limiting instruction immediately was harmless because the court gave the requested instruction at the close of the evidence.

■ We review the failure to give a requested limiting instruction "to ascertain whether we can say with fair assurance that the verdict was not substantially swayed by the error." *Gordon v. United States,* 466 A.2d 1226, 1231 (D.C.1983) (citing *Lucas v. United States,* 436 A.2d 1282, 1284–85 (D.C.1981)). Appellants point to the jury's request for the interview transcript during deliberations as evidence that the jury thought the substance of Daniel Presley's prior statements "was important." However, in light of the proceedings in this case, we can say here that the verdict was not "substantially swayed" by the error. Although it would have been preferable for the trial court to give the limiting instruction immediately when it was requested during trial, this error was mitigated when the court later gave a final jury instruction before deliberations serving the same purpose: the jury was to consider the prior statements solely to evaluate the credibility of Daniel Presley's testimony. *See Byers v. United States,* 649 A.2d 279, 285–86 (D.C.1994); *cf. Mercer, supra,* 864 A.2d at 118 (noting that we generally presume that the jury will follow the trial court's limiting instructions); *Weeda v. District of Columbia,* 521 A.2d 1156, 1163 (D.C.1987) (same). Moreover, the point was made again when the trial court responded to the jury's request for the transcript, emphasizing that Poole's interview with Daniel Presley "was not evidence." Finally, CMR made no reference to Daniel Presley's statements during its closing arguments. Thus, we can say that the trial court's failure to give an immediate limiting instruction was harmless error.

### d. *Rule of Completeness*

■ Appellants also argue that they were improperly barred from introducing other portions of Poole's interview with Daniel Presley in order to place the

parts of the interview that had been presented to the jury in context. "Under the rule of completeness, a party is entitled, once a part of a document or recorded statement has been introduced into evidence, to seek admission of the remainder of the statement." *Andrews v. United States*, 922 A.2d 449, 458 (D.C.2007) (quoting *Henderson v. United States*, 632 A.2d 419, 424 (D.C.1993)) (internal quotation marks omitted). The underlying principle of this rule is fairness: to ensure that a statement may not be unfairly removed from its context. *See Henderson, supra,* 632 A.2d at 426. The rule of completeness, however, is not without its limitations. The rule "allows a party to introduce only so much of the remainder of a document or statement already received as is germane to an issue at trial." *Cox v. United States,* 898 A.2d 376, 381 (D.C. 2006) (quoting *Warren v. United States,* 515 A.2d 208, 211 (D.C.1986)) (internal quotation marks omitted).

Under the circumstances, the rule of completeness did not require the trial court to permit appellants to introduce portions of the interview that did not relate to Daniel Presley's impeachment or place those portions in context. As discussed above, CMR introduced the statements that Daniel Presley made to Poole during the interview for the purpose of impeaching his trial testimony. On redirect examination, the trial court permitted appellants' counsel to question Daniel Presley about other related statements from the interview in order to place the potentially impeaching statements in context and thus rehabilitate him. The trial court subsequently barred appellants from introducing other portions of the interview with Poole that neither related to the impeaching statements nor served to rehabilitate Daniel Presley's testimony. Nevertheless, the trial court did permit appellants to use Daniel Presley's state-

ment from the interview regarding what his brother told him about the accident to refresh his memory. Daniel Presley subsequently testified that his brother told him "that he would hate to think that the crane operator intentionally knocked him off the tower." Appellants did not seek to introduce any other portion of the Poole interview. Thus, we cannot say that the court abused its discretion in refusing to allow appellants to introduce the other portions of Poole's interview of Daniel Presley that did not relate to his impeachment or place it in context.

In conclusion, the evidentiary issues raised by appellants do not warrant reversal. The accident report itself was properly excluded as inadmissible hearsay. Furthermore, the impeachment of Daniel Presley with a statement that he made to Poole was conducted properly. Although the trial court erred by not providing an immediate limiting instruction on the use of impeachment evidence, such error was harmless. In addition, the other portions of Poole's interview were not necessary to place Daniel Presley's prior statements in context beyond the examination that the trial court allowed.

## C. *Motion for Judgment Notwithstanding the Verdict*

▮▮▮▮▮ Appellants contend that the trial court erred by denying their motion for judgment notwithstanding the verdict after the jury returned a verdict in favor of CMR. The trial court's denial of the motion for judgment notwithstanding the verdict "must be affirmed unless the evidence, viewed in the light most favorable to the non-movant, would permit reasonable persons to return a verdict only in favor of the moving party." *District of Columbia v. Minor,* 740 A.2d 523, 529 (D.C.1999) (quoting *Bernstein v. Fernandez,* 649 A.2d 1064, 1070 (D.C.1991)) (in-

ternal quotation marks omitted). "A judgment notwithstanding the verdict is appropriate only in extreme cases, where 'no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.'" *Lyons v. Barrazotto,* 667 A.2d 314, 320 (D.C.1995) (quoting *Oxendine v. Merrell Dow Pharm., Inc.,* 506 A.2d 1100, 1103 (D.C.1986)).

 We are unpersuaded by appellants' argument that the trial court erred by denying their motion for judgment notwithstanding the verdict. In support of their argument, appellants assert that the verdict was against the weight of the evidence because the testimony of the CMR crane operator was completely lacking in credibility. The crane operator provided an eyewitness account that Presley slipped and fell of his own accord. The crane operator's testimony alone, if found credible by the jury, was enough to support the verdict. *See Minor, supra,* 740 A.2d at 529; *cf. Frye v. United States,* 926 A.2d 1085, 1094 (D.C.2005) (noting that the testimony of a single witness, if credited by

the trial court, "can be sufficient to prove beyond a reasonable doubt the charged offense"). Moreover, "[t]he determination of credibility is for the finder of fact, and is entitled to substantial deference." *Bouknight v. United States,* 867 A.2d 245, 251 (D.C.2005) (citing *Byrd v. United States,* 614 A.2d 25, 30 (D.C.1992)). Therefore, we must affirm the trial court's denial of appellants' motion for judgment notwithstanding the verdict.

### D. *Jury Instruction on Appellants' Theory of Liability*

 Finally, we turn to appellants' claim that the trial court erred by rejecting a jury instruction proposed by appellants. Appellants assert that "[t]he fact that another entity may also be liable to plaintiff for the injury sustained is no defense," and that the jury should have been instructed accordingly. However, neither the record nor appellants' brief makes clear what specific proposed instruction the trial court rejected, or whether appellants raised any objection to a specific instruction that was given.[18] As such, we

18. Although unclear, appellants' argument may relate to their "Proposed Special Jury Instruction Number 4." The Special Instruction is the same as Standardized Civil Jury Instructions for the District of Columbia, No. 5–13 (2010 ed. rev.), titled "Concurring Causes," with the exception that it includes the addition of the following language:

> In this case it is not disputed that Grimberg failed to provide OSHA fall protection to Mr. Charles Presley. As to the claim against each defendant, if you find that Grimberg's failure to provide OSHA fall protection was foreseeable by the defendant, you should return a verdict in favor of plaintiffs against the defendant. As to the claim against each defendant, if you find that the defendant could not have foreseen that Grimberg would fail to comply with the OSHA regulation requiring fall protection—such that Grimberg's negligence was the only cause for Mr.

> Presley's injury—then you should return a verdict against the plaintiffs.

The trial court rejected the additional language. Even under the standard of review that would have applied had appellants raised an objection to the instructions rejected or given, appellants' argument does not warrant reversal. "In reviewing a challenge to a jury instruction that was preserved at trial, the central question for this court is whether it is an adequate statement of the law, and whether it is supported by evidence in the case." *Wheeler v. United States,* 930 A.2d 232, 238 (D.C.2007) (citing *Leftwitch v. United States,* 251 A.2d 646, 649 (D.C.1969); *Spade v. United States,* 277 A.2d 654, 656 (D.C.1971)). We consider the instructions as a whole in reviewing the trial court's decision for abuse of discretion. *Id.* Appellants' reliance upon *Ceco Corp. v. Coleman,* 441 A.2d 940 (D.C.1982), to support their argument is misplaced. In *Ceco,* we approved of the trial court's use of Civil Jury Instruction 5.13, but were critical

review the court's failure to give the instruction that appellants claim was required for plain error. *See Williams v. United States*, 858 A.2d 984, 991–92 (D.C. 2004); *see also United States v. Olano*, 507 U.S. 725, 731–32, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). "Under plain error review, appellant must show error that is clear and that affected appellant['s] substantial rights. If those three preliminary requirements are met, the court may notice the error and grant relief if the error would call into serious question the fairness, integrity or public reputation of judicial proceedings." *Pérez v. United States*, 968 A.2d 39, 92 (D.C.2009) (citing *Olano, supra*, 507 U.S. at 732–36, 113 S.Ct. 1770).

Although not entirely clear what specific instruction the trial court rejected, it appears from appellants' brief that appellants wanted the jury to be instructed that, regardless of the possible negligence of Grimberg, CMR and CRSS could still be found liable. The trial court did, in fact, instruct the jury that "[i]t is no defense that some other person who [i]s not a defendant in the case participated in causing the injuries even if it should appear to you that the negligence of the other person was greater than the negligence of the [d]efendant." As the instruction given by the trial court appears to have adequately addressed the principle that appellants wanted to convey, we cannot say that its failure to give the instruction appellants requested was in error, that it was clear error, and that it affected the substantial rights of appellants. *See Pérez, supra*, 968 A.2d at 92.

---

of additional language that suggested that "the jury was not permitted to find the negligence of [a party not included in the suit] to have been the *sole* proximate cause of [the plaintiff's] injury." 441 A.2d at 948. As discussed below, the trial court's instructions as a whole adequately addressed the principle

## III. Conclusion

For the foregoing reasons, we affirm the trial court's judgment. CRSS owed no legal duty—statutory or common-law—to Presley. Therefore, the trial court did not err in granting judgment as a matter of law for CRSS. Further, the evidentiary issues raised by appellants do not merit reversal. While the trial court should have given a limiting instruction on the proper use of impeachment evidence immediately as requested, instead of at the close of the case, the failure to do so was harmless error. Finally, the trial court did not err in denying appellants' motion for judgment notwithstanding the verdict or in instructing the jury. Accordingly, we affirm.

*Affirmed.*

that CMR could still be liable even if Grimberg was negligent, and they were supported by the evidence in this case. Accordingly, we cannot say that the trial court abused its discretion in excluding the additional language proposed by appellants.